**NICHOLAS LABORATORIES LIMITED, Plaintiff,**

**v.**

**ALMAY, INC., Defendant.**

**No. 89 Civ. 3525 (PKL).**

United States District Court, S.D. New York.

Oct. 27, 1989.

Blodnick Abramowitz Newman Schultz & Bass, Lake Success, N.Y. (Frederick Newman, Paula deDominici, of counsel), for plaintiff.

Flemming, Zulack & Williamson, Richard Williams, New York City, for defendant.

LEISURE, District Judge:

Plaintiff Nicholas Laboratories Ltd. ("Nicholas Labs") brings this action for a declaratory judgment that defendant Almay, Inc. ("Almay") has attempted to breach a trademark license agreement between the parties. Plaintiff also asks the Court to declare that defendant Almay cannot terminate plaintiff's right to the trademark license in the absence of plaintiff's default, insolvency, or consent. Almay counterclaims and requests a declaratory judgment that Nicholas Labs has no rights

under the license agreement after June 30, 1990. Nicholas Labs moved for summary judgment under Fed.R.Civ.P. 56. Almay opposed plaintiff's motion and filed a cross-motion for summary judgment.

## BACKGROUND

The parties entered into the License Agreement ("the agreement") on July 1, 1975, under which plaintiff Nicholas Labs was authorized to use a trademark and certain technical information belonging to defendant Almay, Inc. Under the agreement, Nicholas Labs may use these rights to manufacture and distribute cosmetic products. In return, Nicholas Labs must pay Almay royalties on all sales. The parties now dispute the conditions under which the agreement may be terminated. Nicholas Labs claims that its rights under the agreement end only upon its own default, insolvency, or consent. Almay argues that the agreement is broken up into five-year periods, with automatic renewal, unless either party decides to terminate. Thus Almay claims the right to terminate at the conclusion of the current five-year period on July 1, 1990.

Under the agreement, Nicholas Labs must pay to Almay as a trademark royalty 4.5% of Total Net Sales, up to $1.5 million, and 2% of Total Net Sales over that amount. License Agreement, ¶ 5(a). For use of Almay's technical information, Nicholas Labs must pay Almay 3% of Total Net Sales for each fiscal year. License Agreement, ¶ 5(b). In addition, Nicholas Labs had to pay a minimum royalty of $75,000 for each fiscal year during the first five years of the agreement. Thereafter, Nicholas Labs had to pay as a minimum "the greater of $75,000 or the annual average of the total amount of royalties paid in respect to Total Net Sales of all Products other than Licensee Products during the five (5) Fiscal Year period immediately preceding the first of those years." License Agreement, ¶ 5(c). Paragraph 5 contains the only reference to five-year periods in the agreement, aside from the provision on duration of the contract.

The agreement may be terminated by Almay if Nicholas Labs defaults in fulfilling any of its obligations or becomes insolvent. License Agreement, ¶¶ 6–8. In paragraph 9, under the heading "Term of Agreement," the contract states:

> This Agreement shall take effect as of July 1, 1975 and shall continue in effect until June 30, 1980, and thereafter for successive periods of five (5) Fiscal Years, subject to Licensor's [Almay's] right to terminate in accordance with the provision of paragraph 7 above [default by Nicholas Labs], termination in accordance with paragraph 8 above [insolvency of Nicholas Labs], termination by mutual agreement of the parties hereto or termination by Licensee [Nicholas Labs] at any time upon at least 12 months prior notice to Licensor.

The dispute in this lawsuit focuses on the above-quoted provision. Nicholas Labs claims that the agreement can be terminated only upon its own default, insolvency, or consent. Almay argues that the language above allows it to terminate the agreement at will at the end of each five-year period.

Almay was recently acquired by Revlon. On December 20, 1988, Revlon sent a letter to Nicholas Labs stating that the license agreement was to be terminated by Almay on June 30, 1990, the end of the current five-year term. On May 18, 1989, Nicholas Labs filed this lawsuit seeking a declaratory judgment that Almay did not have the power to terminate the agreement in 1990. Both parties subsequently moved for summary judgment.

## DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... [i]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court then must determine whether there does indeed exist a genuine issue as to any material fact; "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.*, 477 U.S. at 249, 106 S.Ct. at 2510; *see also R.C. Bigelow, Inc v. Unilever N.V.*, 867 F.2d 102 (2d Cir.1989).

A summary judgment ruling is appropriate in this case. There are no disputed questions of fact relevant to the central issue. The Court believes that it can interpret the contract within the four corners of the document, and thus enter a judgment without a trial.

### B. Interpretation of the Contract

■ Plaintiff Nicholas Labs argues that the language of paragraph 9 of the agreement clearly provides for continuation of its rights in the license unless one of the specifically enumerated events take place. Nicholas Labs buttresses its claim with references to other parts of the agreement, and also with evidence entirely extrinsic to the agreement. The Court's first task is to attempt to interpret the provision itself. The Court may view the provision in the context of the entire agreement in order to better discern its meaning. But the Court may only refer to extrinsic evidence if there is still ambiguity, and the parole evidence rule does not otherwise apply.

This lawsuit focuses on the first phrase of paragraph 9 of the agreement which reads: "This Agreement shall take effect as of July 1, 1975 and shall continue in effect until June 30, 1980, and thereafter for successive periods of five (5) Fiscal Years, ..." A major dictionary defines the word "until" as "a function word to indicate movement to and arrival at a destination" or as "a function word to indicate movement reaching as far as a limit or stopping point." Webster's Third International Dictionary at 2513 (1981). The second definition given is closest to the most common usage of the word, and it implies a termination of the activity at the point in time stated. However, paragraph 9 of the license agreement goes on to say "and thereafter for successive periods ..." This additional phrase strongly suggests that the agreement was meant to continue and suggests that the first definition of the word "until" set out above represents its intended meaning.

Words in a contract should never be construed as meaningless if they can be made significant by any reasonable construction. *67 Wall Street Co. v. Franklin National Bank*, 37 N.Y.2d 245, 248, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975).[1] Almay argues that the only way that the use of the word "until" and the reference to five-year periods in paragraph 9 can be given meaning is for an implied right of termination to be created. In a paragraph concerning duration of the contract, Almay claims, reference to successive five-year periods must mean that the parties may terminate whenever a period expires.

Nicholas Labs argues that the opening clause of paragraph 9 refers to the five-year periods around which the calculation of royalties owed by Nicholas Labs to Almay is structured. It is unclear why a time period which otherwise only concerns the calculation of royalties need be referenced in a provision relating to the duration of the contract. But it is true that the five-year period is central to the structure of the agreement, and that the agreement could be envisioned as a series of five-year con-

---

1. Jurisdiction is predicated on diversity of citizenship. The parties agreed in the license agreement that New York law would govern the interpretation and construction of the contract. License Agreement, ¶ 18. Because of the choice of law clause, the claims of the parties are governed by New York law. *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 765 n. 1 (2d Cir.1986).

tracts with differing terms running in automatic succession. Based on the language alone, Nicholas Labs' interpretation of the provision is more plausible.

Courts should look to the entire contract to discern the parties' intentions if the meaning of a particular provision remains ambiguous. *International Klafter Co. v. Continental Casualty Co.*, 869 F.2d 96, 99 (2d Cir.1989); *Pantone, Inc. v. Esselte Letraset Ltd.*, 691 F.Supp. 768, 771 (S.D.N.Y. 1988); *Rentaways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347, 126 N.E.2d 271 (1955); *Davlick Construction Corp. v. Krohn Associates, Inc.*, 40 Misc.2d 96, 98, 242 N.Y.S.2d 647, 649 (Sup.Ct. Nassau County 1963); New York Jur 2d, vol. 22, Contracts, § 220. When the Court views the opening clause of paragraph 9 in the context of the entire paragraph and of the rest of the contract, the correctness of plaintiff's position becomes certain. Paragraph 9 goes on to list all of the ways that the contract may be terminated—by the default or insolvency of Nicholas Labs, by mutual consent of both parties, or by Nicholas Labs unilaterally upon at least 12 months prior notice. Previous paragraphs in the contract explain in greater detail the conditions and procedures for termination. Nowhere in the contract is Almay explicitly given the right to terminate at the end of every five-year period, nor are notice requirements established to do so. It is highly unlikely that if the parties intended such a right to exist they would not have expressly discussed and provided for it.

In *Payroll Express Corp. v. Aetna Casualty and Surety Company*, 659 F.2d 285, 292 (2d Cir.1981), the Second Circuit distinguished between "perpetual" and "indefinite" contracts. A perpetual contract runs without end or without provision for its termination. An indefinite contract runs without a fixed end but contains provisions under which the contract might terminate at any time. The New York courts maintain a policy against the enforcement of perpetual contracts on the grounds that great hardship may be worked against one of the parties if the circumstances surrounding the contract substantially change. In distinguishing indefinite contracts from perpetual contracts, the Court wrote:

However, where the parties, while providing no fixed "date for the termination of the promisor's obligation ... condition the obligation upon an event which would necessarily terminate the contract," no such presumption of perpetuity is justified and they will be deemed to have accepted the obligation to continue until the condition occurs.

*Payroll, supra,* 659 F.2d at 292. Thus where termination has been provided for in the contract, even if continuous performance is a possibility, courts should not refuse to enforce such contracts or read into them different conditions of termination. *See also Warner–Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655 (S.D.N.Y.1959), *aff'd,* 280 F.2d 197 (2d Cir.1960) (per curiam); *Ketcham v. Hall Syndicate, Inc.*, 37 Misc.2d 693, 699–700, 236 N.Y.S.2d 206, 212–13 (Sup.Ct.N.Y. County 1962).

The contract in the case at bar has several provisions which deal with termination of the license agreement. It is clear that the parties carefully considered and negotiated the conditions under which the agreement would terminate. Thus the policy of disfavoring perpetual contracts to protect parties against changing conditions has less force. Indeed, both the termination provisions and the changing methods of calculating royalties were crafted by the parties to protect themselves against changing circumstances.

### C. Extrinsic Evidence

■ Plaintiff seeks to bolster its interpretation of the contract with extrinsic evidence—the text of a joint venture agreement signed by each party's predecessor in interest in 1967 and an application to register the trademark with the United Kingdom and Ireland signed by both Nicholas Labs and Almay in 1975. Plaintiff claims that these documents prove that Almay understood that the license agreement was to continue automatically at the end of each five-year period.

The Second Circuit has articulated the parole evidence rule as follows: "The parole evidence rule, moreover, renders legally inoperative only evidence of prior under-

standings and negotiations which contradicts the unambiguous meaning of a writing which completely and accurately integrates the agreement of the parties." *Battery Steamship Corp. v. Refineria Panama, S.A.*, 513 F.2d 735, 739–40 (2d Cir. 1975); *see International Klafter, supra*, 869 F.2d at 99; *Happy Dack Trading Co., Ltd. v. Agro–Industries, Inc.*, 602 F.Supp. 986, 991 (S.D.N.Y.1984). Thus this Court may consider extrinsic evidence if it does not contradict the clear meaning of the contract itself; however, if this Court has established the clear meaning of the contract, then there is no need to engage in further investigation. Because of the findings based on the text of the license agreement, the Court will not consider the extrinsic evidence put forward by plaintiff.

## CONCLUSION

Plaintiff's motion for summary judgment is granted. Defendant's cross-motion for summary judgment is denied. The Court hereby declares that defendant Almay, Inc. has no right under the License Agreement to terminate the agreement on July 1, 1990 or at the end of any subsequent five-year period unless any of the conditions of termination expressly stated in the contract occur.

SO ORDERED.