11-5458
*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2019

(Argued: September 27, 2019    Decided: September 29, 2020)

Docket No. 11-5458

——————————————

COMPANIA EMBOTELLADORA DEL PACIFICO, S.A.,
*Plaintiff-Counter-Defendant-Appellant*,

v.

PEPSI COLA COMPANY,
*Defendant-Counter-Claimant-Appellee*.

——————————————

Before:       JACOBS, SACK, and HALL, *Circuit Judges*.

This appeal arises from a lengthy contract dispute between Pepsi Cola

Company ("PepsiCo") and one of its independent Peruvian bottlers, Compania

Embotelladora Del Pacifico, S.A. ("CEPSA").  CEPSA and PepsiCo had a fruitful

business relationship for approximately forty years, from 1952 until the 1990s.

The relationship then soured.  PepsiCo terminated its contract with CEPSA.

CEPSA then filed suit in the United States District Court for the Southern District

of New York asserting, *inter alia*, breach of contract claims based on wrongful

termination and PepsiCo's alleged failure to protect CEPSA's rights as the

exclusive bottler and distributor of PepsiCo products in specified areas of Peru.

PepsiCo made a motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to

dismiss the wrongful termination claim, which the district court (Jed S. Rakoff,

*Judge*) granted on the grounds that the contract was terminable at will. The case

proceeded to discovery on the remaining claims, after the close of which PepsiCo

moved for summary judgment on the breach of contract claim which was based

on PepsiCo's alleged failure to protect CEPSA's exclusive rights. The district

court granted the motion, concluding that CEPSA had failed to prove damages

and, in the alternative, that PepsiCo had no duty under the contract to

affirmatively protect CEPSA from third parties selling or distributing PepsiCo

products in CEPSA's territory. CEPSA appealed. We agree with the district

court that the contract was terminable at will and that PepsiCo had no

affirmative duty under the contract to protect CEPSA against the alleged harm to

its exclusive rights. Accordingly, the judgment of the district court is

AFFIRMED.

<div style="margin-left:40%">

PETER D. ST. PHILLIP, JR. (Margaret C. MacLean, *on the brief*), Lowey Dannenberg, P.C., White Plains, NY, *for Plaintiff-Counter-Defendant-Appellant.*

</div>

LOUIS M. SOLOMON (Michael S. Lazaroff, *on the brief*), Reed Smith LLP, New York, NY, *for Defendant-Counter-Claimant-Appellee.*

MARCIA V. ANDREW, Taft Stettinius & Hollister LLP, *for Amici Curiae Pepsi-Cola Bottlers' Association.*

HUGH Q. GOTTSCHALK, (Webster C. Cash III, *on the brief*) Wheeler Trigg O'Donnell LLP, *for Amici Curiae Independent Bottlers Association.*

SACK, *Circuit Judge*:

At issue in this case is an "Exclusive Bottler Appointment" contract between Pepsi Cola Company, a Delaware corporation ("PepsiCo"),[1] and one of its bottlers in Peru, Compania Embotelladora Del Pacifico, S.A. ("CEPSA"). Under the contract, PepsiCo granted CEPSA exclusive rights to bottle the beverage Pepsi-Cola[2] in specified regions of Peru. Those regions collectively

---

[1] The company's name has evolved over the years. *See PepsiCo, Inc., Britannica,* https://www.britannica.com/topic/PepsiCo-Inc (last visited 8/13/20). In the contract at issue, it was referred to as the Pepsi-Cola Company. *See* App'x at 121. But this suit was initiated in October 2000 against "Pepsi Cola Company," and we therefore refer to it either as that or as PepsiCo.

[2] The beverage has been known by at least three names, "Pepsi-Cola" (sometimes spelled "Pepsi=Cola"), "Pepsi Cola," and "Pepsi." The first was used in connection with the product at the time many decades ago when its famous jingles first appeared on the radio, *see Flickr,* https://www.flickr.com/photos/dok1/7989107430 (last visited 8/13/20),

3

constituted an exclusive sales territory in which CEPSA was responsible for meeting consumer demand for Pepsi-Cola. The exclusivity of the contract drove its value and in turn encouraged CEPSA's investment in equipment, facilities, and more that were needed to fulfill the bottler's obligations under the contract.

CEPSA's business performed well under the contract for some forty years. But in the 1990s, CEPSA began to experience financial difficulties and stopped making payments to PepsiCo. PepsiCo responded by purporting to terminate the contract.

CEPSA filed suit against PepsiCo in the United States District Court for the Southern District of New York. It asserted breach of contract claims based on, *inter alia*, wrongful termination of the contract,[3] and a claim based on PepsiCo's

---

and on the landmark sign that is still across the East River from the United Nations building in New York City (as "Pepsi=Cola"), *see* David W. Dunlap, *Pepsi-Cola Sign in Queens Gains Landmark Status*, N.Y. TIMES (Apr. 12, 2016), https://www.nytimes.com/2016/04/13/nyregion/pepsi-cola-sign-in-queens-gains-landmark-status.html; and the second was used in the original complaint in this matter. It is currently referred to, at least in the United States, as "Pepsi." *See* PepsiCo, *Product Information*, https://www.pepsico.com/brands/product-information (last visited 8/13/20). For purposes of this opinion, the terms are interchangeable.

[3] It is referred to in the First Amended Complaint as:

BREACH OF CONTRACT
(Wrongful Termination)

CEPSA First Amended Complaint dated Oct. 17, 2008, at 26.

alleged failure to protect CEPSA's right to an exclusive sales territory. PepsiCo moved to dismiss the wrongful termination claim.

The district court (Jed S. Rakoff, *Judge*) granted the motion on the grounds that the contract was terminable at will under New York law, which the parties agree governs this dispute.[4] The court observed that the contract had no definite term of duration but included one paragraph that provided PepsiCo with an optional right to terminate the contract upon the occurrence of one of five enumerated events. Under New York law, a contract of indefinite duration is generally terminable at will unless the contract states explicitly that the parties intended to be bound perpetually. The district court concluded that the contract was not explicit in that regard and therefore was terminable at will.

After the close of discovery, PepsiCo moved for summary judgment on the breach of contract claim — the "transshipment" claim — premised on PepsiCo's alleged failure to protect CEPSA's exclusive rights. The district court granted the motion. It concluded that CEPSA had failed to prove damages on the claim and, in the alternative, that the contract did not obligate PepsiCo to police CEPSA's

---

[4] The contract provides: "This Appointment shall be interpreted under and pursuant to the laws of the State of New York of the United States of America." Exclusive Bottling Agreement between PepsiCo and CEPSA, dated June 6, 1952, at ¶ 30.

territory and protect its exclusive rights. This appeal followed.

On appeal, CEPSA argues that the district court erred in granting PepsiCo's motion to dismiss the wrongful termination claim because the contract expressed clearly the parties' intent to be bound perpetually unless and until one of the events upon which PepsiCo was contractually permitted to terminate occurred. CEPSA also argues that the district court erred by granting PepsiCo's motion for summary judgment because, according to CEPSA, the evidence of damages was sufficient and the contract imposed a duty on PepsiCo that PepsiCo had breached. We disagree. For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

### I. Facts

In 1952, PepsiCo and CEPSA entered into a contract known as an "Exclusive Bottler Appointment" (the "EBA" or the "contract"). Under the contract, CEPSA was appointed as PepsiCo's exclusive bottler of Pepsi-Cola in specified regions of Peru, including Peru's largest city and capital, Lima. Under its terms, PepsiCo agreed to sell "beverage concentrate" to CEPSA. CEPSA was responsible for combining the beverage concentrate with filtered carbonated

water to produce Pepsi. Pursuant to the EBA, CEPSA was obliged to bottle, sell, and distribute Pepsi within its appointed territory, "and nowhere else."[5]

The EBA had no definite term of duration. Paragraph 22 of the EBA provided, however, that PepsiCo had the right to "cancel or terminate [the EBA] by written notice" to CEPSA "[u]pon the happening" of five enumerated events: CEPSA's (1) breach of the contract, (2) sale or transfer of all or part of its business or stock without PepsiCo's permission, (3) failure to bottle for thirty consecutive days, (4) insolvency, voluntary bankruptcy, or failure to vacate an involuntary bankruptcy, or (5) loss of management or control of its business. EBA ¶ 22. PepsiCo did not, however, have the obligation to terminate the EBA upon the happening of any of these events. And CEPSA had no equivalent contractual right to terminate the EBA.

According to CEPSA, its relationship with PepsiCo under the contract grew "consistently" for approximately forty years. Appellant's Br. at 8–9. But

---

[5] The EBA provided further that PepsiCo would: retain control over all decisions concerning its trademark; instruct CEPSA on how to prepare, bottle, sell, and distribute the beverage; provide CEPSA with all relevant materials, including bottles, cartons, and cases; decide how many bottling plants should be built; and furnish all advertising materials. The EBA specified the price at which CEPSA initially sold Pepsi drinks to retailers, but by the 1990s (the period relevant to this appeal), PepsiCo allowed CEPSA to set its own prices.

then, in the early 1990's, according to CEPSA, PepsiCo required CEPSA to switch from bottling Pepsi in glass returnable bottles to plastic returnable bottles. Implementing the change was costly and to meet the cost, CEPSA took on substantial debt. For whatever reason, by 1996, CEPSA was allegedly "experiencing difficult financial circumstances," CEPSA First Amended Complaint dated Oct. 17, 2008, at 13, ¶ 46, and "fell behind in its . . . payments" for beverage concentrate,[6] *id.* at 21, ¶ 89.

CEPSA alleges that PepsiCo's conduct beyond the change in bottles caused or contributed to its financial distress and plummeting sales. Specifically, CEPSA asserts that PepsiCo: (1) failed to provide CEPSA with a timely marketing plan for 1997, (2) failed to prevent two other exclusive PepsiCo bottlers in Peru from "transshipping," or selling outside their exclusive territory — and inside CEPSA's, and (3) interfered with its business by, among other things, sabotaging a potential merger.

In 1998, CEPSA's debts continued to increase. On August 12, 1998, one of CEPSA's creditors filed an insolvency petition against the company in Peru. Then, on March 12, 1999, PepsiCo notified CEPSA by letter that it was

---

[6] CEPSA did not generate positive net income in any year from 1991 through 1998.

terminating the EBA, effective April 24, 1999. The letter cited five grounds for termination: CEPSA's alleged (1) failure to promote sales adequately, (2) insolvency, (3) failure to pay for concentrate, (4) failure to provide marketing funds, and (5) failure to vacate an involuntary bankruptcy petition. Following the termination, CEPSA was placed into involuntary liquidation proceedings in Peru.

## II.    Procedural History

On October 11, 2000, CEPSA filed a complaint in the United States District Court for the Southern District of New York. It asserted three breach of contract claims for: (1) failure to promote brand recognition, (2) failure to enforce CEPSA's exclusive rights, and (3) wrongful termination of the EBA. PepsiCo answered the complaint and asserted several counterclaims, including one for failure to pay for beverage concentrate. Years of litigation followed, primarily on the issue of whether the suit had been properly authorized by CEPSA's creditors. In 2008, that issue was resolved in the affirmative, and the case was reassigned from United States District Judge Richard Owen, to whom it had originally been assigned, to District Judge Jed S. Rakoff.

On October 17, 2008, CEPSA filed an amended complaint. It reasserted its

three breach of contract claims and added two tort claims for breach of fiduciary duty and willful destruction of business.  PepsiCo moved to dismiss the new tort claims and the wrongful termination breach of contract claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  On December 18, 2008, the district court held oral argument on the motion and issued a ruling from the bench.  The court granted PepsiCo's motion to dismiss in its entirety and dismissed CEPSA's tort claims and wrongful termination claim.  Of those dismissals, only the district court's dismissal of the wrongful termination claim is before us on appeal.

In granting PepsiCo's motion to dismiss the wrongful termination claim, the district court noted that both parties agreed the EBA had "no definite term." Oral Argument Transcript dated Dec. 18, 2008 at 49:6.  The court explained that under New York law — which all parties agree governs this dispute — "a contract for an indefinite duration is terminable at will" unless "the parties intend that the obligation be perpetual" and "expressly say so." *Id.* at 49:2–4.  Paragraph 22 of the EBA provided PepsiCo "with an optional remedy upon the occurrence of certain nonexclusive events," *id.* at 49:21–23, the "mere listing" of which, the court concluded, "is not the kind of 'clear and unequivocal' demonstration that is required under New York law to say that the parties intended to be perpetually

bound." *Id.* at 50:7–10. Accordingly, the court dismissed CEPSA's wrongful termination claim in addition to the tort claims not at issue on appeal.

The case proceeded to discovery on CEPSA's two remaining breach of contract claims and on PepsiCo's counterclaims. After the close of discovery, PepsiCo moved for summary judgment on CEPSA's breach of contract claim based on PepsiCo's alleged failure to enforce CEPSA's exclusive rights by allegedly failing to prevent transshipment into CEPSA's territory.[7]

On September 4, 2009, the district court granted PepsiCo's motion. Relevant here, the court concluded that CEPSA's claim that PepsiCo failed to prevent other bottlers from "transshipping," or selling outside their exclusive territory into CEPSA's territory, failed because CEPSA had not met the standard of proof required for its alleged damages. And, in the alternative, the court concluded that the transshipment claim failed as a matter of law because the EBA imposed no duty on PepsiCo to prevent or police transshipment.

The court first addressed whether the damages that CEPSA sought for lost profits due to transshipment were general damages that must be proved with a

---

[7] In addition, though not relevant here, CEPSA filed a cross-motion for summary judgment on PepsiCo's counterclaim for failure to pay for beverage concentrate, which the district court granted.

"reasonable estimate" or consequential damages that must be proved "with reasonable certainty." Opinion and Order dated Sept. 4, 2009, Special App'x at 65 (quoting *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 109–10 (2d Cir. 2007)). The court explained that "[a]s a general matter, 'lost profits' constitute 'general damages' when 'the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract.'" *Id.* (quoting *Tractebel*, 487 F.3d at 109). Such damages are "precisely what the non-breaching party bargained for." *Id.* at 10 (quoting *Tractebel*, 487 F.3d at 109–10). By contrast, lost profits constitute consequential damages "when, as a result of the breach, the non-breaching party suffers loss or profits on collateral business relationships." *Id.* (quoting *Tractebel*, 487 F.3d at 109).

The court concluded that the damages CEPSA sought for lost profits due to transshipment were consequential damages because they were "lost profits from lost sales to third-parties that [were] not governed [by] the EBA." *Id.* Accordingly, the court decided that CEPSA was required to prove damages under the more exacting standard of "reasonable certainty." *Id.* at 11 (quoting *Kenford Co. v. Cty. of Erie*, 67 N.Y. 2d 257, 261 (1986)).

CEPSA, the court stated, was unable to do so because it had failed to

proffer admissible expert testimony concerning damages. And the lay testimony that it had offered — a declaration from Manuel Tirado, CEPSA's former general manager and chief financial officer — was inadmissible because: (1) CEPSA had never identified Tirado as a damages witness, and (2) the court could not conclude that Tirado's testimony was (a) based on his own personal knowledge, or (b) based on scientific, technical, or other specialized knowledge that would permit him to proffer such "lay testimony masquerading as expert testimony." *Id.* at 9 n.4.

But, the court said, even if CEPSA could "point to . . . admissible evidence capable of proving damages to a reasonable certainty," *id.* at 11, its transshipment claim would nonetheless fail because the EBA is unambiguous and "does not contain any express language" obligating PepsiCo to "take affirmative steps to prevent other bottlers and third-parties from selling [Pepsi] in CEPSA's territory." *Id.* at 12. The court therefore declined to "read such obligations into the EBA." *Id.* Similarly, it rejected the proposition that the implied covenant of good faith and fair dealing gave rise to any such obligations. *See id.* at 13–16.

The parties voluntarily dismissed their remaining claims and judgment

was entered.[8] CEPSA timely appealed the district court's decisions granting PepsiCo's motions to dismiss the wrongful termination claim and for summary judgment on the transshipment claim.

## DISCUSSION

On appeal, CEPSA challenges the district court's grant of PepsiCo's motion to dismiss the wrongful termination claim and the court's grant of summary judgment in favor of PepsiCo on the transshipment claim. CEPSA argues that the district court erred in granting PepsiCo's motion to dismiss the wrongful termination claim because the EBA is a "perpetual" contract. According to CEPSA, paragraph 22 expresses the parties' intent to continue to be bound "unless and until" one of the events enumerated therein occurs "and [PepsiCo] opts to terminate." Appellant's Br. at 19. CEPSA argues further that to the extent that the EBA is ambiguous, the district court erred by failing to consider extrinsic evidence of the parties' intent that, as CEPSA puts it, the EBA is to "continue in perpetuity." *Id.* at 20.

CEPSA also argues the district court erred in granting PepsiCo's motion

---

[8] CEPSA voluntarily dismissed its remaining breach of contract claim on July 17, 2009, prior to the district court's decision on the motion and cross-motion for summary judgment. PepsiCo voluntarily dismissed its remaining counterclaims after the court's decision, on October 13, 2009.

for summary judgment on the transshipment claim. CEPSA contends that under the EBA, PepsiCo had a duty to "take steps to prevent other bottlers' product from being sold in CEPSA's exclusive sales territory." *Id.* In addition, CEPSA argues that the damages arising from transshipment were general, not consequential damages, that CEPSA could prove with admissible evidence.

For the reasons that follow, we conclude that CEPSA's challenges are without merit.

## I.    Standard of Review

We review *de novo* a district court's grant of a motion to dismiss, in this case on the wrongful termination claim, for failure to state a claim. *See Kelleher v. Fred A. Cook, Inc.*, 939 F.3d 465, 467 (2d Cir. 2019). We also review *de novo* a district court's grant of summary judgment, in this case on the "transshipment" claim, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (internal quotation marks omitted).

## II.    Analysis

1. *Wrongful Termination Claim*

The district court granted PepsiCo's motion to dismiss CEPSA's wrongful termination claim because the court concluded that the EBA was terminable at will.  On appeal, CEPSA contends that this conclusion was error.

CEPSA argues first that the text of the EBA is clear:  It binds the parties in perpetuity until one or more of the events enumerated in paragraph 22 occurs *and* PepsiCo elects to terminate the contract.

We disagree.  Under New York law, it is well settled that a contract of indefinite duration is terminable at will unless the contract states expressly and unequivocally that the parties intend to be perpetually bound.  *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F. Supp. 655, 661 (S.D.N.Y. 1959), *aff'd on opinion of the district court*, 280 F.2d 197 (2d Cir. 1960) ("[I]f it appears that no termination date was within the contemplation of the parties, or that their intention with respect thereto cannot be ascertained, the contract will be held to be terminable within a reasonable time or revocable at will . . . ."); *Liberty Imports v. Bourguet*, 536 N.Y.S.2d 784, 786 (1st Dep't 1989) ("[C]ontracts of exclusive agency and distributorship are terminable at will in the absence of an express

provision of duration . . . ."); *accord Haines v. City of New York*, 41 N.Y.2d 769, 771–72 (1977); *Interweb v. iPayment, Inc.*, 783 N.Y.S.2d 468, 468 (1st Dep't 2004). In the case at bar, the EBA contains no such clear statement of perpetuity. It therefore is terminable at will subject to any reasonable duration requirement.

CEPSA argues that this conclusion is untenable because it would render paragraph 22 — which provided that PepsiCo had the right to "cancel or terminate [the EBA] by written notice" to CEPSA "[u]pon the happening" of certain events, Appellant's Br. at 24 (quoting EBA ¶ 22) — meaningless and therefore conflicts with New York law's preference against surplusage, *see id.* (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.* 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." (internal quotation marks and brackets omitted))); *see also Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013) (referring to the preference as the "canon against surplusage"); *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 106 (2011) (referring to it as the "canon against superfluity"). Alternatively, CEPSA argues that the inclusion of paragraph 22 in the EBA creates an ambiguity with respect to the contract's duration that must be resolved by extrinsic evidence.

We are unpersuaded. The Supreme Court made clear over a century ago, as a general matter of contract interpretation, that provisions specifying grounds for termination or abrogation in an at-will contract are not necessarily surplusage. *Willcox & Gibs Sewing Mach. Co. v. Ewing*, 141 U.S. 627, 636 (1891). Such provisions may serve a "caution[ary]" function, warning of conduct or an occurrence that might prompt one party to terminate. *See id.*

Moreover, in the case at bar, paragraph 22 served a separate function independent of any precaution. In some circumstances, New York law imposes a reasonable-duration requirement on exclusive distribution agreements that are otherwise terminable at will. *See, e.g.*, *Copy-Data Sys. v. Toshiba Am.*, 755 F.2d 293, 301 (2d Cir. 1985). Such a requirement may arise in circumstances such as these where a distributor must invest in equipment, materials, and other assets to perform its obligations under the contract. *See id.*; *Colony Liquor Distribs. v. Jack Daniels Distillery*, 254 N.Y.S. 2d 547, 549 (3d Dep't 1964). Against this backdrop, paragraph 22 is not meaningless. It provides PepsiCo with grounds to terminate without having to wait a reasonable duration before doing so.

The cases that CEPSA relies upon do not affect our analysis.[9]  *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017 (2d Cir. 1985) and *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008) are inapposite because both concern

---

[9] Nor do the cases that *amicus curiae*, the Pepsi-Cola Bottlers' Association ("PCBA"), principally rely upon for the proposition that the EBA was terminable only upon the occurrence of an event listed in paragraph 22.

We have explained previously that, under New York law, "where the parties [to a contract], while providing no fixed date for termination of the promisor's obligation . . . condition the obligation upon an event which would *necessarily* terminate the contract, no such presumption of perpetuity is justified and they will be deemed to have accepted the obligation to continue until the condition occurs." *Payroll Express Corp. v. Aetna Cas. & Sur. Co.*, 659 F.2d 285, 292 (2d Cir. 1981) (emphasis added; internal quotation marks omitted).  Four cases PCBA cites involve just such a condition.  *See id.*; *Nicholas Labs. Ltd. v. Almay, Inc.*, 723 F. Supp. 1015 (S.D.N.Y. 1989), *aff'd* 900 F.2d 19 (2d Cir. 1990); *Warner-Lambert Pharm. Co.*, 178 F. Supp. 655; *Ehrenworth v. Stuhmer & Co.*, 229 N.Y. 210 (1920).  By contrast, the EBA does not condition the parties' obligations upon an event which would *necessarily* terminate the contract.  Moreover, the events listed in paragraph 22 do not necessarily terminate the contract, they merely provide PepsiCo with an option to terminate.  These four cases therefore do not control the analysis here.

The fifth case that PCBA cites, *Ketcham v. Hall Syndicate, Inc.*, 236 N.Y.S. 2d 206 (Sup. Ct. 1962), *aff'd without opinion*, 242 N.Y.S.2d 182 (1st Dep't 1963), involves a contract in which an artist agreed to create and provide cartoons for syndication indefinitely.  The contract stated expressly that it would renew automatically from year to year, except that both parties had the right to terminate if the artist's share of revenue fell below a stipulated amount.  The court held that the contract was not indefinite as to its duration, even if it provided for perpetual performance, because "specific provision [was] made for termination." *Ketcham*, 236 N.Y.S. at 213.  We recognize that the provision for termination in the contract in *Ketcham*, like the EBA, is voluntary, not automatic.  The provision in *Ketcham*, however, was mutual while the one in the EBA is not.  It does not follow that a contract with a voluntary, *unilateral* termination provision is one in which "specific provision was made for termination" because, from the perspective of one party, there is no such provision for termination and the contract is perpetual.  PCBA has pointed to no authority holding otherwise and we are aware of none.

contracts with definite terms.  At issue in both cases were contract provisions

that seemed to conflict with the end dates specified in the contracts.  This conflict

gave rise to ambiguity that permitted us to consider extrinsic evidence.  In

*Rothenberg* and *Chapman*, the contracts did not involve — nor did we consider —

an entirely optional right to terminate an indefinite contract.

Our conclusion that the EBA was terminable at will does not mean that

PepsiCo's termination rights were unrestricted.  As pointed out above, even

without a provision limiting termination, such a contract may be subject to a

reasonable-duration requirement under New York law.  We think that

requirement may, at least hypothetically, arise in circumstances where a

distributor must invest in special purpose equipment, materials, and other assets

in order to perform its obligations under the contract only to have the other party

pull the rug out from under the distributor by terminating the contract.  But

CEPSA does not argue that in the present circumstances, forty years between

execution and termination was "unreasonable" for these purposes.  The issue

does not arise here, and we therefore do not address it.

2. *Transshipment Claim*

The district court granted summary judgment in favor of PepsiCo on the

transshipment claim on the grounds that CEPSA had failed to prove damages,
and, in the alternative, that PepsiCo had no duty to prevent or police
transshipment. [10] CEPSA argues that both conclusions were erroneous.

CEPSA asserts first that PepsiCo did in fact have a duty to police
transshipment under the EBA. However, as the district court observed, the EBA
is "unambiguous" on this point. Opinion and Order dated Sept. 4, 2009, Special
App'x at 68. It "prohibited PepsiCo from appointing another bottler to serve

---

[10] With respect to CEPSA's transshipment claim, *amicus curiae*, the IBA, urges us to
"address the district court's damages ruling and stop there." IBA Br. at 2. The IBA
contends that the district court's contract interpretation was "unnecessary to its
decision" and "stray[ed]" into "industry-critical contract issues that are unnecessary to
resolve this appeal." *Id.* We conclude that the IBA's assertion that we may decide this
appeal without considering whether the EBA imposed a duty on PepsiCo to prevent or
police transshipment is mistaken. Under New York law, nominal damages are always
available in a breach of contract action even if a party cannot prove general or
consequential damages. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 95 (1993) (stating that
"[n]ominal damages are always available in breach of contract actions"); *see also Tradex
Europe SPRL v. Conair Corp.*, 2008 WL 1990464, at *5 (S.D.N.Y. 2008) (denying summary
judgment regarding breach of contract claim because defendant "fail[ed] to address
whether [p]laintiffs may . . . recover *nominal* damages" even though they failed to
produce evidence of any direct or consequential damages); *Magu Realty Co. v. Spartan
Concrete Corp.*, 658 N.Y.S.2d 45, 46 (2d Dep't 1997) ("[A]lthough the plaintiffs have failed
to demonstrate that they incurred any actual damages resulting from the alleged breach
of contract . . . , they may still be entitled to nominal damages to vindicate their rights
arising from the alleged breach of contract."); *Hirsch Electric Co. v. Comm. Servs., Inc.*, 536
N.Y.S.2d 141, 143 (2d Dep't 1988) ("[A]lthough the plaintiff has failed to demonstrate
damages which would be recoverable at trial with respect to the lost profits claim, it is a
well-settled tenet of contract law that even if the breach of contract caused no loss or if
the amount of loss cannot be proven with sufficient certainty, the injured party is
entitled to recover . . . nominal damages . . . .").

CEPSA's exclusive territory or selling PepsiCo product directly into that territory," but it did not "obligate[] PepsiCo to take affirmative steps to prevent other bottlers and third-parties from selling [Pepsi] in CEPSA's territory." *Id.* Because the EBA is "straightforward and unambiguous," we may not consider extrinsic evidence or the parties' course of dealing, nor may we read additional requirements into unambiguous text in search of such an obligation. *Id.* at 67–68 (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)); *see also id.* at 68 (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 73 (2d Cir. 1979) (Mansfield, *J.*, concurring)). We must interpret the EBA according to its text and its text is clear — it imposed no such duty on PepsiCo.

CEPSA contends that, notwithstanding the clear text of the EBA, PepsiCo had a duty to police transshipment under the implied covenant of good faith and fair dealing. PepsiCo argues that the covenant does not apply to the EBA because it is an at-will contract. Appellee's Br. at 50–51 (citing *Coca-Cola N. Am. v. Crawley Juice, Inc.*, 2011 WL 1882845, at *10 (E.D.N.Y. May 17, 2011) (determining that under New York law, the covenant does not apply to an at-will distribution contract)). But assuming *arguendo* that the covenant applies, our conclusion remains the same.

We agree with the district court that under New York law, the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties. *See*, *e.g.*, *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (concluding that the implied duty of good faith and fair dealing cannot be used to "add[] to the contract a substantive provision not included by the parties" (internal quotation marks omitted)); *Vanlex Stores, Inc. v. BFP 300 Madison II LLC*, 887 N.Y.S.2d 576, 581 (1st Dep't 2009) (stating that the "implied covenant of good faith and fair dealing inherent in every contract cannot be used to create terms that do not exist in the writing"). As noted, the EBA prohibited PepsiCo from "appointing another bottler to serve CEPSA's exclusive territory or selling PepsiCo product directly into that territory," but it did not "obligate[] PepsiCo to take affirmative steps to prevent other bottlers and third-parties from selling PepsiCo in CEPSA's territory." Opinion and Order dated Sept. 4, 2009, Special App'x at 68. Because the duty to police or protect against transshipment was not created or referred to in the writing, PepsiCo was not required to assume such a duty under the covenant.

CEPSA argues that this conclusion conflicts with that of our sister circuit addressing the same issue in *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo,*

23

*Inc.*, 431 F.3d 1241 (10th Cir. 2005). In *Pittsburg*, the parties had entered into an exclusive bottler appointment agreement for the beverage Pepsi in 1959. *See id.* at 1248. From 1960 through 1998, they entered into nine additional such agreements for other beverages. *See id.* At issue was whether PepsiCo had breached the agreements by failing to protect against transshipment. *See id.* 1254. The Tenth Circuit applied the New York Uniform Commercial Code ("UCC"), which permits courts to consider parties' post-contract conduct, *see* N.Y.U.C.C. §§ 2–202(a), 2–208, cmt. 1, to decide the issue. *Id.* at 1259. To the extent that our sister circuit applied the UCC to bottler appointment agreements entered into prior to the effective date of the UCC, we think, respectfully, that this was error. The UCC became effective on September 27, 1964 and applies only to contracts entered into on or after that date. *See* NYUCC §§ 13–101, 13–105.

In the case at bar, the EBA was entered into in 1952.[11] The UCC therefore does not apply, and we can ignore it.

We must therefore apply the New York common law of contracts. And

---

[11] CEPSA and PepsiCo entered into an additional EBA in 1993 for PepsiCo's Seven-Up products. *See* First Amended Complaint ¶ 13. But the allegations in the complaint are based only on the EBA; they do not refer to the "Seven-Up Appointment." *See id.* ¶¶ 35–45, 112–118.

under New York common law, "[w]here a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (quoting *De Luca v. De Luca*, 751 N.Y.S.2d 766, 766 (2d Dep't 2002)). We already have concluded that the EBA is clear and that we may not consider extrinsic evidence as the Tenth Circuit did in *Pittsburg*. The Tenth Circuit's conclusion, based on such extrinsic evidence, therefore does not guide our analysis or compel any particular result here.[12]

Thus, CEPSA's assertion that PepsiCo's purported duty to police or prevent transshipment fails because we conclude that PepsiCo had no such duty. Accordingly, we need not reach CEPSA's third argument regarding damages and

---

[12] In addition to the foregoing, there are salient factual differences between the case at bar and *Pittsburg*. Specifically, in *Pittsburg*, PepsiCo's obligations pursuant to a transshipment enforcement program (TEP), which protected the exclusive territories of its U.S. bottlers, were at issue. *See Pittsburg*, 431 F.3d at 1250, 1258. We are not aware of any such TEP program that protects bottlers in Peru.

The Independent Bottlers Association ("IBA"), a non-profit corporation that represents PepsiCo's U.S. independent bottlers and *amicus curiae* in this case, contends that the EBA in this case is identical or substantially similar to the agreements between PepsiCo and IBA's member-bottlers. As a result, it warns, a decision affirming the district court would 'threaten[] to disrupt the long held expectations and obligations between PepsiCo and its [U.S. independent bottlers]." IBA Br. at 1. But agreements such as those of the IBA's members are not before us, and we do not consider them here. We decide this appeal on the basis of the specific agreement and circumstances before us.

exclusion of evidence to affirm the judgment of the district court.

## CONCLUSION

We have considered CEPSA's remaining arguments on appeal and conclude that they are without merit. We therefore AFFIRM the judgment of the district court.