[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-11340

_____

LUJERIO CORDERO,

Plaintiff-Appellant,

*versus*

TRANSAMERICA ANNUITY SERVICE CORPORATION,
a.k.a. Wilton Re Annuity Service Corporation,

Defendant-Third-Party Plaintiff-Appellee,

TRANSAMERICA LIFE INSURANCE COMPANY,

Defendant-Cross Claimant-Appellee,

2                    Opinion of the Court                    21-11340

ALLIANCE ASSET FUNDING, LLC, et al.,

                              Third-Party Defendants-Cross Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:18-cv-21665-DPG

_____

Before WILSON, ROSENBAUM, Circuit Judges, and CONWAY,* District Judge.

PER CURIAM:

This appeal involves a plaintiff who received a structure settlement because of a tort injury but ultimately sold his settlements to a factoring company. Factoring companies routinely reach out to injured tort victims who received structured settlements and provide lump-sum cash payments to those individuals in exchange for the settlement payments often at significantly less than face value. Because of factoring companies' possible abusive and exploitative tactics in negotiating with injured tort victims, almost every state has statutes to protect the victims from those possible tactics.

_____

* Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

In the case on appeal, plaintiff-appellant Lujerio Cordero, a childhood victim of lead poisoning, assigned his rights to more than $900,000 in structured settlement payments to factoring companies for pennies on the dollar. However, as a result of the lead poisoning, Cordero lacked the capacity to understand the six structured settlement transfer agreements he entered into with the factoring companies—agreements that contained allegedly false statements about Cordero's need for immediate funds and failed to disclose his limited mental capacity.[1] Nevertheless, Florida state courts—after holding hearings where Cordero was not present or represented, sometimes hundreds of miles away from his home— approved the six agreements based on the factoring companies' incomplete set of facts.

Rather than suing the factoring companies directly, however, Cordero sued defendants-appellees Transamerica Annuity Service Corporation and Transamerica Life Insurance Company (collectively, "Transamerica"), the companies that issued and funded his periodic payments before he assigned them to the factoring companies. By suing Transamerica, Cordero seeks to hold it accountable for consenting to his assignments. Our opinion relates

---

[1] Cordero uses the phrases "diminished mental capacity" and "limited mental capacity" in his briefing; therefore, we adopt his terminology for the purposes of this opinion.

to Cordero's breach of contract claim, which the district court dismissed with prejudice.[2]

This case presents a novel issue of New York law: whether a plaintiff sufficiently alleges a breach of the implied covenant of good faith and fair dealing if he demonstrates that the defendant drastically undermined a fundamental objective of the parties' contract, even when the underlying duty at issue was not explicitly referred to in the writing? Because this is an important question without a clear answer, we certify it to the New York Court of Appeals.

## I

We begin with the facts as alleged in Cordero's second amended complaint.[3]

### A. Cordero's Settlement Agreement and Qualified Assignment

During his early childhood, Cordero fell victim to lead poisoning caused by the paint in his New York apartment building. The lead poisoning resulted in debilitating and permeant health

---

[2] In his appeal, Cordero also challenges the district court's with-prejudice dismissal of his claim for exploitation of a vulnerable adult under Florida's Adult Protective Services Act, Florida Statute § 415.1111. We defer our decision on this claim. *See infra* Part IV.

[3] For the purposes of this appeal, we assume that the factual allegations of the second amended complaint are true, and we draw all reasonable inferences in Cordero's favor.

issues, including permanent cognitive impairment. As a result, Cordero, acting through his mother as guardian, sued the landlord.

Cordero subsequently executed a structured settlement agreement (the "Settlement Agreement") with his landlord's insurer. The Settlement Agreement released the landlord and his insurance carrier from liability in exchange for periodic payments to Cordero—$3,183.94 each month for thirty years—beginning when he turned eighteen. The Settlement Agreement states that Cordero's payments shall be provided for and secured by an annuity contract issued by Transamerica Life Insurance Company and that Transamerica Annuity Service Corporation will fund the periodic payments through the annuity contract. The Settlement Agreement also recognizes the parties' consent to a qualified assignment of the liability to make the periodic payments.

On the day that Cordero executed the Settlement Agreement, he entered into another agreement with his landlord's insurance company and Transamerica Annuity Service Corporation titled "Transamerica Qualified Assignment and Release" (the "Qualified Assignment"). Both the Settlement Agreement and the Qualified Assignment contain New York choice of law provisions as well as anti-assignment provisions.

Important to this case, the Settlement Agreement includes a section titled "Payee's Rights to Periodic Payments" that states, in relevant part: "Said periodic payments cannot be accelerated, deferred, increased or decreased by the Plaintiff(s) or any Payee . . . nor shall the Plaintiff(s) have the power to sell, mortgage,

encumber or anticipate same, or any part thereof, by assignment or otherwise." Similarly, the Qualified Assignment states: "None of the Periodic Payments may be accelerated, deferred, increased or decreased and may not be anticipated, sold, assigned or encumbered." The parties received special tax treatment because they executed a qualified assignment pursuant to 26 U.S.C. §§ 104 and 130. *See id.* § 130(c) (stating that the term "qualified assignment" refers to "any assignment of a liability to make periodic payments as damages . . . if such periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments").

### B. Cordero's Six Structured Settlement Transfers

Roughly four years after Cordero began receiving payments under the Settlement Agreement and the Qualified Assignment, he entered into the first of six structured settlement transfer agreements with two factoring companies. Cordero's mother helped facilitate the first agreement when he was twenty-two years old, and a salesman helped him fill out the necessary documents, which he lacked the capacity to understand. In this initial agreement and the five that followed, Cordero exchanged his rights to monthly payments for immediate lump-sum cash payments.

Although the terms of his transfers varied, all six agreements were extremely unfavorable to Cordero. Under the terms of the sixth (and least favorable) agreement, Cordero received only $22,000.00 in exchange for an aggregate value of $167,134.42 in monthly payments. Through these six transfers, Cordero assigned away all of his periodic payment rights over a period of twenty-two

months, receiving only $268,130.00 from the factoring companies in return for his remaining structured settlement payments with a total aggregate value of $959,834.42 spread over more than twenty years.

Cordero's six structured settlement transfer agreements were facilitated pursuant to Florida's Structured Settlement Protection Act (Florida's "SSPA"). Fla. Stat. § 626.99296. Florida's SSPA provides that a structured settlement payment rights transfer is only effective if "the transfer is authorized in advance in a final order by a court of competent jurisdiction[.]"[4] *Id.* § 626.99296(3)(a). To approve a transfer agreement under Florida's SSPA, the reviewing court must find, among other things, that: (1) the transfer "does not contravene other applicable law"; (2) the "payee has established that the transfer is in [his] best interests"; and (3) "the net amount payable to the payee is fair, just, and reasonable under the circumstances then existing." *Id.* § 626.99296(3)(a)(1), (3), (6).

Under Florida's SSPA, the factoring companies that handled Cordero's assignments were required to provide notice of each

---

[4] 26 U.S.C. § 5891 generally imposes "a tax equal to 40 percent of the factoring discount" on "any person who acquires . . . structured settlement payment rights in a structured settlement factoring transaction." *Id.* § 5891(a). However, the statute provides an exception for structured settlement factoring transactions that are "approved in advance in a qualified order." *Id.* § 5891(b)(1). Forty-nine states have enacted corresponding statutes that provide instructions on obtaining a "qualified order." *See, e.g.*, Fla. Stat. § 626.99296.

proposed transfer and the application for its authorization to Transamerica. *Id.* § 626.99296(4)(a). In response, Transamerica could "support, oppose, or otherwise respond to the transferee's application, in person or by counsel, by submitting written comments to the court or by participating in the hearing." *Id.* § 626.99296(4)(a)4 (requiring the factoring companies to inform interested parties that they "may" support, oppose, or otherwise respond to the application).

Cordero's six transfer agreements vaguely alleged a variety of seemingly false reasons why he needed the immediate payments, such as outstanding debts, school expenses, and purchasing a reliable vehicle. Cordero waived his right to "independent professional advice" for each transfer, and he asserts that he lacked the capacity to understand the preprinted form that was used to obtain his waivers as well as the transfer agreements that he signed. Nevertheless, Cordero signed the agreements, sometimes in the presence of a notary, and each agreement included a document that reflected Transamerica's consent. However, Transamerica consented to each transfer without contacting Cordero or seeking his informed consent.

A Florida state court approved each transfer agreement after a hearing, but the six hearings were not recorded. Cordero did not attend the hearings, and he was not represented by counsel at them. Instead, the factoring company was the only party represented at Cordero's SSPA hearings. The hearings occurred in either

21-11340            Opinion of the Court            9

Sumter or Broward County, though Cordero lived in Miami-Dade County.[5]

Despite the fact that every transfer was highly unfavorable to Cordero, Florida courts approved all six of Cordero's structured settlement transfers. In the meantime, Transamerica received a $750.00 administrative fee from the factoring companies for each transfer.

## II

When we have substantial doubt about the answer to a dispositive question of state law, we "should certify that question to the state supreme court in order to avoid making unnecessary state law guesses and to offer the state court the opportunity to explicate state law." *Fla. VirtualSchool v. K12, Inc.*, 735 F.3d 1271, 1274–75 (11th Cir. 2013) (quoting *Forgione v. Dennis Pirtle Agency, Inc.*, 93 F.3d 758, 761 (11th Cir. 1996)) (internal quotation marks omitted). This useful tool allows us "to avoid making unnecessary *Erie* 'guesses'" when a case presents a determinative question of state law not controlled by precedent. *Whiteside v. GEICO Indem. Co.*, 977 F.3d 1014, 1018 (11th Cir. 2020) (quoting *CSX Transp., Inc. v. City of Garden City*, 325 F.3d 1236, 1239 (11th Cir. 2003)) (internal quotation marks omitted); *see* N.Y. Ct. App. R. § 500.27(b).

---

[5] We take judicial notice of the facts that: (1) Miami-Dade County is located in south Florida, next to Broward County and (2) Sumter County is located in central Florida, more than two hundred miles away from Miami-Dade County. *See* Fed. R. Evid. 201.

While we note that Cordero only raised this tool in a foot-note in his reply brief, we nevertheless conclude that "a party need not raise the issue at all" because certification primarily relates to federalism concerns. *Whiteside*, 977 F.3d at 1018. "Ordinarily a court will order certification on its own motion, given that it is in the best position to determine whether it feels confident in its reading of the state law." *Id.* (quoting 17A Charles Alan Wright et al., *Federal Practice and Procedure* § 4248 (3d ed. 1998)) (internal quotation marks omitted).

### III

Our question for the New York Court of Appeals relates to Cordero's breach of contract claim. In his second amended complaint, Cordero alleges that Transamerica breached the anti-assignment language in the Settlement Agreement and the Qualified Assignment when it allowed Cordero to assign his payment rights to the factoring companies. While Cordero and Transamerica agree that New York law governs the agreements, they disagree as to whether Transamerica had a duty to "enforce" the anti-assignment language. Transamerica argues that neither anti-assignment provision imposed any express duty on Transamerica and the provisions inured to its benefit, not Cordero's. Although Cordero asserted multiple theories of liability in his briefing, our question focuses on whether Transamerica breached the covenant of good faith and fair dealing, which is implicit in every contract under New York law. *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018).

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (citation and internal quotation marks omitted). The covenant of good faith and fair dealing encompasses "any promises which a reasonable person in the position of the promisee would be justified in understanding were included," and it "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (citations and internal quotation marks omitted). If the underlying contract "contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Id.* A party may also breach the implied covenant if it exercises its discretion "malevolently, for its own gain as part of a purposeful scheme designed to deprive [the other party] of the benefits" of the agreement. *Richbell Info. Servs., Inc. v. Jupiter Partners, L.P.*, 765 N.Y.S.2d 575, 587 (N.Y. App. Div. 2003).

"The duty of good faith and fair dealing, however, is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton*, 663 N.E.2d at 291–92. Under "New York law, the covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020)

(applying New York law); *see Vanlex Stores, Inc. v. BFP 300 Madison II LLC*, 887 N.Y.S.2d 576, 577 (N.Y. App. Div. 2009) ("[T]he implied covenant of good faith and fair dealing inherent in every contract cannot be used to create terms that do not exist in the writing.").

In arguing that Transamerica breached the implied covenant of good faith and fair dealing, Cordero cites to *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002). In *Jennifer Realty*, the New York Court of Appeals considered whether the sponsor of a plan to convert a building into a cooperative breached the covenant of good faith and fair dealing when it held on to forty-one of the sixty-six apartments, allowed its offering plan to lapse, and rejected purchase offers for the unsold units. *Id.* at 498. Specifically, the tenant-owners and co-op board asserted that the sponsor breached "its contractual duty to dispose of all its shares within a reasonable time." *Id.*

The trial court "dismissed the contract claim, finding that the offering plan contained no promise by the sponsor to sell unsold shares within any particular time frame." *Id.* The Appellate Division reversed, holding "that the sponsor's offering plan included an implied promise to sell all unsold units within a reasonable time." *Id.* at 499; *see 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 729 N.Y.S.2d 34, 36 (N.Y. App. Div. 2001) (citations omitted) (stating that "[i]mplied promises are recognized when either the promises are so clearly within the contemplation of the parties that it is unnecessary to express them, or when the promises

are beyond the thought of the parties but necessary to effectuate the purpose of the contract" and that "[t]he intentions of the parties to the contract are instructive of whether an implied promise exists"). Ultimately, the New York Court of Appeals affirmed the Appellate Division and found that the plaintiffs stated a cause of action for breach of contract. *Jennifer Realty Co.*, 773 N.E.2d at 499.

The Court of Appeals concluded that the plaintiffs' complaint "sufficiently alleged, at a minimum, that the sponsor undertook a duty in good faith to timely sell so many shares in the building as necessary to create a fully viable cooperative," explaining:

> The complaint asserts that the sponsor—by its initial offering plan and each of its 10 periodic amendments—offered for sale the shares in the cooperative corresponding to its 66 apartments, but instead retained a majority of those shares. The complaint narrates that the sponsor had represented that its expected profits would depend on market conditions and the length of time required to sell shares offered under the offering plan, but gave no hint that it would make a sizeable profit by retaining a majority of those shares and leasing apartments at market rates, free of the strictures of rent regulation. Similarly, the complaint states that the offering plan cautioned purchasers as to numerous investment risks, but did not mention the risk that the sponsor would keep most of the shares for itself. Based primarily on these allegations, plaintiffs assert that the parties could not have intended—and plaintiffs could not reasonably

> anticipate—that the sponsor would retain a majority of shares in the cooperative.
>
> Moreover, the complaint alleges that by keeping a majority of shares, the sponsor defeated the purpose of the contract. Plaintiffs assert that by rejecting offers from prospective buyers and allowing its offering plan to lapse, the sponsor frustrated plaintiffs' ability to resell their shares, interfered with the Co-op Board's refinancing of the building's mortgage and caused shareholders' maintenance payments to increase. . . . In sum, plaintiffs allege that the sponsor's retention of shares so drastically undermined the contract that its fundamental objective—the creation of a viable cooperative—has been subverted.

*Id.* at 499–500. While the Court of Appeals confirmed that the plaintiffs sufficiently "pleaded that they reasonably understood the offering plan to state a duty, at the very least, to sell a sufficient number of shares in a timely manner so as to create a viable cooperative," it held only that the plaintiffs' contract cause of action survived the sponsor's motion to dismiss. *Id.* at 501 (analyzing the motion to dismiss under N.Y. C.P.L.R. 3211).

In light of *Jennifer Realty*, it appears plausible that, under New York law, a plaintiff may allege a breach of the implied covenant of good faith and fair dealing if he sufficiently pleads that the defendant drastically undermined a fundamental objective of the parties' contract, even when the contract does not explicitly refer to the underlying duty at issue. *See id.* ("By spelling out the basis

for their claim that the sponsor failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the offering plan, plaintiffs pleaded a valid cause of action for breach of contract."). However, we are unsure whether we can equivocally derive this rule from *Jennifer Realty*, or whether such a rule would apply in this specific context. It is possible that the New York Court of Appeals intended *Jennifer Realty* to apply narrowly to cases dealing with similar subject matter or only to cases where the law related to the contract at issue was well-settled when the parties executed the contract. Lacking clarity, we appeal to the New York Court of Appeals for assistance.

## IV

This case presents a novel issue of New York law because Cordero seeks to hold Transamerica liable for consenting to his assignments of his structured settlement payments. This issue is important. It raises public policy concerns related to the conduct of factoring companies as well as companies that issue and fund annuities. Accordingly, we respectfully certify the following question to the New York Court of Appeals under Rule 500.27[6]:

> Does a plaintiff sufficiently allege a breach of the implied covenant of good faith and fair dealing under New York law if he pleads that the defendant

---

[6] New York Court of Appeals Rule 500.27(a) allows "any United States Court of Appeals" to certify a determinative question of law to the New York Court of Appeals if there is no controlling precedent.

16                Opinion of the Court                21-11340

drastically undermined a fundamental objective of the parties' contract, even when the underlying duty at issue was not explicitly referred to in the writing?

Our question is intended to serve only as a guide, and "we do not intend to restrict the issues considered by the state court or to limit the state court's discretion in choosing how to frame or to answer these issues in the light of the facts of this case." *Whiteside*, 977 F.3d at 1022 (citation and internal quotation marks omitted). Rather, we "know that the [New York Court of Appeals] may do as it wishes," and we "ask broadly for the state court's help in getting the state law right in this case." *Id.* (quoting *F.D.I.C. v. Skow*, 741 F.3d 1342, 1347 (11th Cir. 2013)) (internal quotation marks omitted).

The entire record of this case, including the parties' briefs, is transmitted to the New York Court of Appeals, along with our gratitude for the Court's time and consideration. We defer our decision in this appeal until the Court of Appeals has had the opportunity to consider our certified question.

**QUESTION CERTIFIED.**