Trump v Trump (2023 NY Slip Op 23180)

[*1]

Trump v Trump

2023 NY Slip Op 23180

Decided on June 9, 2023

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on June 9, 2023
Supreme Court, New York County

Donald J. Trump, Plaintiff,

against
Mary L. Trump, The New York Times Company D/B/A The New York Times, Susanne Craig, David Barstow, Russell Buettner, John Does 1 Through 10, and ABC Corporations 1 Through 10, Defendant.

Index No. 453299/2021

Attorneys for the Plaintiff Donald J Trump:
Michael T. Madaio, Habba Madaio & Associates LLP 
Alina Habba, Habba Madaio & Associates LLP 
Attorneys for the Defendant Mary L Trump:
Anne Marie Champion, Gibson, Dun & Crutcher 
Michael Nadler, Gibson, Dun & Crutcher
Theodore Joseph Boutrous, Gibson, Dun & Crutcher

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 002) 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 60, 61, 62, 63, 64, 65, 66 were read on this motion to/for DISMISS.
In this lawsuit, Donald J. Trump ("plaintiff"), a former president of the United States, asserts various claims against his niece, Mary L. Trump ("Mary Trump"), The New York Times Company d/b/a The New York Times ("The Times"), the individually named journalists Susanna Craig ("Craig"), David Barstow ("Barstow") and Russell Buettner ("Buettner"), along with unnamed John Does and unnamed ABC Corporations (collectively "defendants"), for their actions related to the publishing of The Times' 2018 article, "Trump Engaged in Suspect Tax Schemes as He Reaped Riches from His Father." Additionally, plaintiff seeks to recover against Mary Trump for the publication of her book, "Too Much and Never Enough: How My Family Created the World's Most Dangerous Man." Mary Trump, the complaint alleges, caused her [*2]book to be published in open defiance of confidentiality obligations she owed to plaintiff.
In motion sequence number 002, Mary Trump moves, pursuant to CPLR 3211(a)(1), (a)(7), and (g), to dismiss each of the claims asserted against her and for an order, based on New York's amended anti-SLAPP law, directing plaintiff to pay the attorneys' fees and costs incurred defending against plaintiff's claims.
BACKGROUND
Factual Background
Shortly after the death of Frederick C. Trump—plaintiff's father and Mary Trump's grandfather—disputes arose between various members of the Trump family regarding the estate of Frederick C. Trump and that of his wife, Mary Anne Trump (NYSCEF Doc. No. 1, complaint at 15-19). Mary Trump, joined by her brother Fred Trump III (individually and on behalf of his son, William Trump), his wife, and their mother (collectively, the "objectants"), filed objections to the probate of both estates against co-executors plaintiff, Robert Trump (plaintiff's brother), and Maryanne Trump Barry (plaintiff's sister) (collectively, the "proponents") (id. at 17). The objectants also commenced litigation seeking to reinstate certain health insurance coverage that the proponents cut off in alleged retaliation for their objections to the probate proceedings (id. at 18).
The parties to the estate proceedings engaged in voluminous discovery, which, among other things, produced certain tax and financial records concerning plaintiff. Then, in April of 2001, the parties executed a settlement agreement to "fully, finally, and globally" resolve the filed actions and proceedings (id. at 23; see also NYSCEF Doc. No. 26, Ex. 9, the settlement agreement). The settlement agreement's stated purpose was to effect a "compromise[] and settle[ment], on a 'global basis' in order to resolve all of [the parties'] differences pertaining to two (2) probate proceedings; [an] insurance case; partnership and corporate interests; as well as their interests in two (2) inter vivos trusts" (the settlement agreement at 5). Under the agreement, the proponents also acquired Mary Trump's interests in the family business.
Paragraphs 2 and 3 of the settlement agreement contain reciprocal confidentiality provisions. Paragraph 2 specifically provides that without the express consent of all three proponents—including plaintiff—objectants:
"shall not disclose any of the terms of [the Settlement Agreement], and in addition shall not directly or indirectly publish or cause to be published, any diary, memoir, letter, story, photograph, interview, article, essay, account, or description or depiction of any kind whatsoever, whether fictionalized or not, concerning their litigation or relationship with the 'Proponents/Defendants' or their litigation involving the Estate of FRED C. TRUMP, and the Estate of MARY ANNE TRUMP, or assist or provide information to others in connection therewith" (id. at 27). Paragraph 3, on the other hand, binds plaintiff and the other proponents to extend the same promises concerning confidentiality to the objectants, including Mary Trump (settlement agreement, paragraph 3). Defendants contend that while the confidentiality provisions state that the agreement itself is confidential and that the parties may not discuss their relationship in the context of the estate disputes, the provisions do not extend confidentiality to documents exchanged during discovery in the estate proceedings.
Many years after the execution of the settlement agreement, as the public's interest in plaintiff's affairs began to grow—eventually culminating with his entry into national politics—The Times began scrutinizing some of plaintiff's public statements regarding his [*3]personal finances and entrepreneurial endeavors (NYSCEF Doc. No. 46 at 4). While running for President, plaintiff promised to disclose his tax returns (id.). [FN1]
His failure to do so—even after his election—fueled speculation that the tax returns would contradict his public statements about his finances (id.). Then, in 2016, The Times obtained portions of plaintiff's tax returns and published an article revealing that he may have avoided taxes for nearly two decades (complaint at 34-36). The publication of that article further sparked public debate, and since then, plaintiff's taxes have become a frequent subject of media attention (id.).
At The Times, Craig, Barstow, and Buettner were tasked with covering plaintiff's financial affairs (id. at 7-9). As part of their ongoing efforts to report on the topic, in 2017, Craig approached Mary Trump at her home to seek information for "a very important story about [the Trump] family finances" (id. at 39). Mary Trump initially declined to speak with Craig (id. at 40), but Craig continued reaching out to Mary Trump, assuring her that her cooperation could help "rewrite the history of the President of the United States" (id. at 43).
Sometime after the first visit from Craig, Mary Trump changed her mind and decided to call Craig. She and Craig discussed documents from the estate disputes that had remained in Mary Trump's client file at the offices of her attorneys, the Farrell Fritz law firm.[FN2]
Mary Trump initially considered the possibility that she might have to "smuggle" these documents out of her attorney's office, but instead she received permission from her attorneys to take an extra copy from them (id. at 45, 48). Once receiving those documents from her attorneys, Mary Trump shared them with The Times (id. at 49). Mary Trump never received authorization from any of the proponents to share the documents with The Times (id. at 50).
Plaintiff contends that Mary Trump's actions constitute a blatant breach of paragraph 2 of the settlement agreement—which, from his reading, had plainly mandated confidentiality with respect to the documents exchanged in discovery in the estate proceedings. Plaintiff also contends that The Times was aware that Mary Trump's actions would constitute a violation of the settlement agreement. In fact, the complaint alleges, Craig made such acknowledgments publicly (id. at 58). According to plaintiff, Mary Trump would not have breached the applicable confidentiality provision were it not for The Times' persistent efforts (id. at 59). Therefore, plaintiff contends, The Times tortiously interfered with the contract between Mary Trump and plaintiff, without justification, to plaintiff's detriment.
On October 2, 2018, The Times published an article, credited to Barstow, Craig, and Buettner, entitled "Trump Engaged in Suspect Tax Schemes as He Reaped Riches from His Father" (the "2018 article") (id. at 67). The article's subject matter was described immediately below the headline: "The president has long sold himself as a self-made billionaire, but a Times investigation found that he received at least $413 million in today's dollars from his father's real estate empire, much of it through tax dodges in the 1990s" (NYSCEF Doc. No. 45, Ex. C, at 2). The 13,000-word article explained in detail the various methods that plaintiff and his parents allegedly used to "dodge taxes," including "set[ting] up a sham corporation to disguise millions of dollars in gifts"; "tak[ing] improper tax deductions worth millions more"; and "formulat[ing] a strategy to undervalue his parents' real estate holdings by hundreds of millions of dollars on tax returns" (complaint at 68-70). The stock price of The Times rose 7.4% during the week of the publication of the article (id. at 73).
About two years later, Mary Trump decided to write a book of her own about her family, focusing on, among other things, her relationship with plaintiff (id. at 76). The book, entitled "Too Much and Never Enough: How My Family Created the World's Most Dangerous Man" (the "book"), initially was scheduled to release during the summer of 2021 (id. at 77). The publisher, Simon & Schuster, moved the release date to July 14, 2020, given the "high demand and extraordinary interest in the work" (id.). On June 26, 2020, plaintiff's brother, Robert, filed suit in the Supreme Court of Dutchess County seeking a temporary restraining order to block publication of the book. Although a TRO was initially granted, the Appellate Division, Second Department vacated the TRO as against Simon & Schuster and modified it as to Mary Trump.[FN3]
In denying the TRO, the Appellate Division recognized that a TRO constituting a prior restraint on speech would be a drastic measure and that the settlement agreement's confidentiality provisions could alternatively be enforced "through the imposition of money damages" (Trump v Trump, 2020 NY App Div LEXIS 5683, *10-11 [2nd Dep't 2020]).[FN4]

The book was released on July 14, 2020 (complaint at 78). According to plaintiff, the book contains a litany of alleged accounts and descriptions concerning Mary Trump's relationship with plaintiff, the facts underlying the estate proceedings, and other information protected under the settlement agreement, including the intra-family disputes regarding Frederick C. Trump's will; valuations regarding the assets in Frederick C. Trump's estate; asset transfers between the parties to the settlement agreement; details regarding confidential settlement discussions between the parties; the terms of confidential and sealed court records; and the terms and contents of confidential documents exchanged in discovery in the estate proceedings (id. at 80). Plaintiff never authorized or consented to the publication of the book (id. at 82). The book allegedly sold 1.35 million copies within the first week after its release (id. at 89).
The instant action
On September 21, 2021, plaintiff commenced this action complaining of defendant Mary Trump's disclosure of documents to The Times and the publication of her book, and seeking $100,000,000 in compensatory and punitive damages. In this action, he does not specifically [*4]challenge the truth of either the book or The Times' report. Instead, plaintiff brings claims against Mary Trump for breach of contract, breach of the implied covenant of good faith and fair dealings, and unjust enrichment (complaint at 92-118).
In motion sequence number 002, Mary Trump moves, pursuant to CPLR 3211(a)(1), (a)(7), and (g), to dismiss all the claims asserted against her and for an order, based on New York's amended anti-SLAPP law, directing plaintiff to pay the attorneys' fees and costs incurred defending against plaintiff's claims.
DISCUSSION
1. Are plaintiff's claims, as asserted against Mary Trump, covered by the anti-SLAPP law?
SLAPP suits—or strategic lawsuits against public participation—are characterized as having little legal merit but "filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future" (600 W. 115th St. Corp. v. Von Gutfeld, 80 NY2d 130, 137 [1992]). The law, as amended, applies to suits that target "action involving public petition and participation" as well as any "lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest" (NY Civ Rights Law § 76-a[1][a][2]). Once triggered, plaintiffs can avoid dismissal only if they establish that they have a "substantial basis in law" for their claims or "a substantial argument for an extension, modification or reversal of existing law" (CPLR 3211[g][1]). If a defendant prevails in securing dismissal of the case, it is entitled to seek reimbursement of its costs and attorneys' fees from the plaintiff, along with compensatory and punitive damages (NY Civ Rights Law § 70-a[1][a]).
Here, Mary Trump argues that each claim asserted against her predicates liability on protected speech — the publication of the book and the provision of documents to a journalist reporting on issues of public interest and concern. According to defendant, her writings constitute communications in a public forum (Civ Rights Law § 76-a[1][a][1]; see Lindberg v. Dow Jones & Co., 2021 WL 3605621, at *7 [SDNY 2021] [newspapers are public fora]). Defendant further asserts that her conduct in procuring the confidential documents for The Times falls within the ambit of the anti-SLAPP law's section 76-a[1][a][2] because it "help[ed] to advance" and "assist[ed] in the exercise" of free speech (Ojjeh v. Brown, 43 Cal App 5th 1027, 1039-42 [Ct App 2019]). And, finally, according to Mary Trump, there can be no dispute that the issues herein constitute issues of public interest, especially in light of the statutory mandate to construe the meaning of "public interest" broadly to include "any subject other than a purely private matter" (Civ Rights Law §76-a[1][d]).
Plaintiff, on the other hand, contends that his claims against Mary Trump are not subject to the anti-SLAPP law because the claims are not premised on the actual publication of the book or the article, but are based upon on Mary Trump's alleged violation of a binding settlement agreement that explicitly prohibited such publication. In other words, because plaintiff's claims are contractual in nature, they do not impede upon a "communication...in a public forum" in any manner meant to be addressed by the anti-SLAPP law. Plaintiff further highlights that Mary Trump has not cited any case law in which a court has applied the anti-SLAPP law to contractual claims arising from a breach of a confidentiality agreement.
Both parties agree that, because the anti-SLAPP law in New York has been amended in recent years, many of the issues arising out of the amended statute are novel and of first impression. Both parties thus often cite California cases in support of their arguments, on the premise that California's decisions should be persuasive to this court, as California's and New [*5]York's anti-SLAPP statutes closely mirror one another. Indeed, the Appellate Division, First Department confirmed this approach in a case scrutinizing New York's amended anti-SLAPP law. There, the Appellate Division held that a lower did not err in "applying the California anti-SLAPP statute, which is similar to the applicable New York Civil Rights Law provisions" (Aristocrat Plastic Surgery, PC v Silva, 206 AD3d 26, 28 [1st Dep't 2022]. Therefore, this court here will consider California's authority in addition to New York case law.
Mary Trump principally relies on Navellier v. Sletten (29 Cal 4th 82, 89-93 [2002]) for the proposition that the anti-SLAPP statute can, and should, be applied to the plaintiff's contract claim. In Navellier, the parties entered into a partial settlement agreement that did not fully resolve their federal action, and, while still pending, the defendant filed counterclaims against the plaintiff. The plaintiff filed a separate suit in state court alleging that the defendant breached the partial settlement agreement, and, in response, the defendant asserted an anti-SLAPP claim (id.). The court ultimately found that the anti-SLAPP claim had no merit, but noted that it could potentially be applied in such a scenario since the filing of a counterclaim is protected "petitioning activity" (id.). In other words, the court observed that the anti-SLAPP law could be considered, because it found that the plaintiff sued the defendant only in reaction to the counterclaims he filed in federal court, not because there was a legitimate legal controversy concerning the enforcement of the confidentiality agreement.
The holding in Navellier was later addressed by multiple courts, including in LiMandi v. Wildman Harold Allen & Dixion, LLP, where the plaintiff there sued the defendant for breaching the confidentiality provision of the parties' settlement agreement from a prior lawsuit (CA2/2 B234460 [Cal Ct App 2013], plaintiff's brief at 9-10). The defendant attempted to invoke the anti-SLAPP law, but the court found that anti-SLAPP could not apply because the prior lawsuit had already been concluded. The court also noted that the anti-SLAPP law was not applicable because the claims arose from the breach of a confidentiality agreement, finding that the "[t]he anti-SLAPP statute affords no protection to [a] defendant who breaches a contract limiting his right to speak publicly on matters of public interest" (id.). The court further noted that "[a]ny other outcome would render confidentiality provisions used to promote a settlement utterly worthless and illusory for both defendants and plaintiffs who settle court cases to maintain their privacy" (id.).
Defendant takes issue with plaintiff's reliance on LiMandi, essentially asking the court to disregard the case on the basis that the decision was never officially published. But LiMandi is in accord with other published decisions, including those by appellate courts (see City of Alhambra v. D'Ausilio, 193 Cal App 4th 1301, 1308 [2011]). In City of Alhambra, as part of a settlement of an earlier civil rights suit brought against a city, D'Ausilio agreed to cease advocating on behalf of the city's firefighters (id. at 1304). After executing the agreement, however, D'Ausilio continued to urge the firefighters to demonstrate against the city and participated in a protest himself (id.). The city eventually brought a cause of action for declaratory relief, alleging that an actual controversy existed between the parties concerning their respective rights and duties under the settlement agreement (id.).
In affirming the trial court's denial of D'Ausilio's anti-SLAPP motion, the court of appeal held that the "City did not sue [D'Ausilio] because he engaged in protected speech," but rather because "it believed he breached a contract which prevented him from engaging in certain speech-related conduct and a dispute exists as to the scope and validity of the contract," and that the suit, therefore, did not "arise from" the protected activities (id. at 1307-08).
Here, too, the parties entered into the settlement agreement as a global resolution of the estate proceedings and other intra-familial litigation. The agreement contains confidentiality provisions that bind the parties not to discuss the underlying litigation publicly (complaint at 27). The provisions also explicitly prohibit the parties from publishing books or articles concerning the parties' relationship and the estate litigation (id.). In an alleged violation of those provisions, Mary Trump first assisted The Times with publishing the 2018 article, which, at least in part, reported on the parties' relationship and relied on documents that were exchanged during the estate litigation. Two years later, Mary Trump published a book, which, according to the complaint, contains details regarding confidential settlement discussions between the parties, the terms of confidential and sealed court records, and the terms and contents of confidential documents exchanged through discovery proceedings (id. at 80).
This court is satisfied that, in alleging his breach of contract claim against Mary Trump, plaintiff has established, at least at this pre-discovery stage, a "substantial basis in law" for the pursuit of such claim. This court cannot, at this point, presume that plaintiff initiated this suit to target the protected activity of publishing a book. At the center of this action is an allegation that Mary Trump "breach[ed] a contract which prevented [her] from engaging in certain speech-related conduct" (City of Alhambra, 193 Cal App 4th at 1307-08). The scope and validity of the settlement agreement at issue herein is a live controversy subject to multiple lawsuits, one even initiated by defendant herself. [FN5]
This weighs against Mary Trump's argument that plaintiff's claims, as asserted against her, constitute the type of frivolous lawsuit that the anti-SLAPP statute was meant to root out. Instead, at this point, this court must acknowledge that plaintiff's lawsuit raises at least debatable issues concerning whether her conduct was permitted under the parties' settlement agreement.
In motion sequence 003 of this action, Mary Trump's co-defendant, The Times, also argued that New York's amended anti-SLAPP law encompasses plaintiff's claims as asserted against The Times. This court agreed with The Times.[FN6]
However, plaintiff's claims against The Times rang essentially in tort, while the claims against Mary Trump are contractual in nature. Unlike Mary Trump, The Times was not alleged to have owed any contractual duties to plaintiff, let alone any involving confidentiality. Moreover, a wealth of case law supports the notion that the press is constitutionally protected to engage in the activity of newsgathering.[FN7]
These protections do not cease to exist even when the press (or other media) induces its sources to breach their confidentiality duties (Huggins v. Povitch, 1996 WL 515498 [Sup Ct NY Cty [*6]1996]). In contrast, Mary Trump has not cited any case law in which a court has held that breaching one's own confidentiality obligations, by virtue of engaging in commercial speech and publishing a book that specifically addresses matters that are deemed confidential, constitutes, as a matter of law, a protected activity under the anti-SLAPP statute.
The court's refusal to apply the anti-SLAPP law in connection with plaintiff's claims against Mary Trump, however, should not be read as an endorsement of such claims. Whether plaintiff ultimately proves any violation of the applicable confidentiality provision is a separate issue for another day. This court, in refusing to apply the anti-SLAPP statute upon defendant's application here, only holds that plaintiff's claims are not so insubstantial as to be presumed to constitute a mere strategy for targeting Mary Trump's exercise of her First Amendment rights. Here, there is an actual legal controversy concerning the enforceability of the confidentiality agreement. Accordingly, the court finds that New York's amended anti-SLAPP law does not apply to prohibit plaintiff's claims as asserted against Mary Trump. As a consequence, defendant may not invoke CPLR 3211 (g), and, thus the court will analyze the sufficiency of plaintiff's pleading in light of CPLR 3211(a)(1) and (a)(7).
2. Has Mary Trump demonstrated that plaintiff's contract claim fails as a matter of law?
Mary Trump argues that the settlement agreement, insofar as it relates to the confidentiality provisions, is unenforceable as a matter of law. Defendant first contends that the confidentiality provisions are terminable at will because the provisions lack an end date. Defendant also contends that plaintiff materially breached one of the confidentiality provisions himself, thereby losing the right to enforce the agreement against Mary Trump. Finally, defendant argues that the agreement is impermissibly vague and runs afoul of public policy.
a. Is the settlement agreement terminable at will?
Mary Trump has not demonstrated that the settlement agreement is terminable at will as a matter of law. Paragraph 2 of the settlement agreement reads as follows:
"Without obtaining the consent of DONALD J. TRUMP [or the other 'Proponents/Defendants'] MARY L. TRUMP [and the other 'Objectant/Plaintiffs'] shall not disclose any of the terms of this Agreement and Stipulation, and in addition shall not directly or indirectly publish or cause to be published, any diary, memoir, letter, story, photograph, interview, article, essay, account, or description or depiction of any kind whatsoever, whether fictionalized or not, concerning their litigation or relationship with the 'Proponents/Defendants' or their litigation involving the Estate of FRED C. TRUMP, and the Estate of MARY ANNE TRUMP, or assist or provide information to others in connection therewith."
Defendant correctly points out that the settlement agreement's confidentiality provisions contain no end date. She argues that this renders the applicable provision unenforceable, because "it is well settled that a contract of indefinite duration is terminable at will unless the contract states expressly and unequivocally that the parties intend to be perpetually bound" (Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Corp., 976 F3d 239, 245 [2d Cir 2020]). That the parties are "free to terminate" such an agreement, defendant argues, necessarily precludes "establish[ing] the contract was breached" (Beter v. Murdoch, 2018 WL 3323162, at *8 [SDNY 2018)], aff'd, 771 F App'x 62 [2d Cir 2019]).
The cases cited by defendant are distinguishable, however, as these cases involve commercial agreements for services (see Compania Embotelladora v. Pepsi, 976 F3d 239 [2d Cir 2020] [involving commercial exclusivity agreement]; Dorsett-Felicelli, Inc. v. Cnty. of [*7]Clinton, 2011 WL 1097859 [NDNY 2011]) [involving commercial provider agreement]; Hampton Navigation v. Pinpoint Sys. Int'l, 245 AD 485 [2d Dep't 1997] [involving commercial dealership agreement]).[FN8]

Plaintiff, on the other hand, cites a First Department decision — binding on this court — in which the appellate court considered the question of whether the absence of durational limits in confidentiality agreements renders them unenforceable (Ashland Management v. Altair Investments, 59 AD3d 97, 104 [1st Dep't 2008]). In finding "no legal support for the position that the absence of a durational limitation renders a confidentiality agreement void as a matter of law," the Ashland court emphasized that "the essential part of [confidentiality] agreements is not their duration but the prohibition against using confidential information" (id. at 106). It further noted that, since courts have "the power to enforce the covenants to the extent [they] deem reasonable," the absence of a "limited or reasonable durational limit is of no moment." (id. at 106). In sum, the court held that "the mere fact that [a] confidentiality agreement [is] not limited in duration does not necessarily make [it] ipso facto unenforceable" (id.).[FN9]

It is worth noting that the Ashland court recognized that, in the absence of a definitive expiration term, courts have the authority to find an unlimited duration to be overbroad, and that the proper remedy in such circumstances is to "modify the agreements' duration to one more [*8]reasonable under the circumstances" (id. at 105). To determine what constitutes a reasonable term, the Ashland court wrote, a court ought to consider factors such as the geographic and durational scope of the agreement's provision, and the parties' purpose and intent for entering into such agreement (id. at 101). In the matter now before this court, defendant contends that the intent of the settlement agreement's confidentiality provision was only to encourage a fair resolution of the then-existing estate disputes and that, upon such resolution, the provision would no longer apply (defendant's brief at 8). Plaintiff, by contrast, argues that the parties intended for the provision to run beyond the parties' resolution of the disputes, as evidenced by (i) the settlement agreement's recitals, which indicate that the settlement agreement is a 'global' settlement of the estate proceedings and other related litigation, implying a full and final resolution of the estate cases; (ii) the language of the confidentiality provisions, which is deliberately comprehensive, plainly stating that the provisions would apply to "any" memoir, "any" book, "any" "article," indicating the intent for the provisions to encompass any future actions that the parties may engage in; (iii) the parties' signing of a general release which runs into perpetuity; and (iv) the fact the parties agreed to "join in the motion to seal [the] records," a process which also extends into perpetuity.
This court agrees with plaintiff's contention that the mere absence of a durational term does not, on its own, render the applicable confidentiality provision unenforceable. At the same time, in light of the First Department's decision in Ashland Management, plaintiff's suggestion that the applicable provision is of "unlimited" duration may perhaps yet determined to be overbroad, as, ultimately, the court may be prevailed upon to modify or blue pencil such provision (id. at 105). Both parties agree that, in determining the scope of the applicable provision, the court should consider the parties' intent in entering into a confidentiality agreement. To that end, defendant relies on paragraph 1 of the settlement agreement,[FN10]
while plaintiff relies on the recitals and paragraph 2 of the settlement agreement.[FN11]

It is well settled that, on a motion dismiss pursuant to CPLR 3211 (a) (1), the opposing party need only assert facts that "fit within any cognizable legal theory" (Bonnie & Co. Fashions, Inc. v Bankers Trust Co., 262 AD2d 188 [1st Dep't 1999]). Further, if any question of fact exists concerning the meaning and intent of the contract in question, a dismissal pursuant to CPLR 3211 (a) (1) is precluded (Khayyam v Doyle, 231 AD2d 475 [1st Dep't 1996]).
Considering that the parties have yet to engage in discovery, and that there are questions regarding the reasonableness, meaning and intent behind the parties entering into the confidentiality agreement at issue, a dismissal, at this juncture, would be inappropriate.
Mary Trump also contends that the terms of the confidentiality provisions are impermissibly vague. For instance, the provisions prohibit "directly or indirectly publish[ing] or caus[ing] to be published" material concerning a variety of topics, but fail to define any of those words (NYSEF Doc No 62, settlement agreement paragraphs 2-3). Defendant argues that the lack of definitions forecloses a breach of contract claim. The complaint, however, clearly alleges that defendant breached paragraph 2 by disclosing confidential information about her 'relationship' with plaintiff in the context of the estate proceedings, both by assisting The Times with the publishing of the 2018 article and by publishing a book of her own, some two years later. In addition to alleging that the book "contains detailed accounts and descriptions of her relationship with Plaintiff and the facts and circumstances underlying the Estate Actions," the complaint also asserts that the book revealed information about "[t]he intra-family dispute regarding the distribution of Fred Trump's will," and "[c]onfidential settlement discussions between the parties to the Settlement Agreement" (complaint at 80).
The confidentiality provisions may not be drafted perfectly, but certainly they may be read to encompass and extend to the purported breaches of writing a book or assisting with an article explicitly discussing the parties' relationships and underlying estate disputes. If the confidentiality provisions contain a level of ambiguity, the provisions, in any event, are not so vague as to render the agreement unenforceable as a matter of law. In this regard, the Second Circuit has observed: "[i]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim" [Eternity Glob. Master Fund. v. Morgan Guar., 375 F3d 168, 178 [2d Cir. 2004]).
For all the reasons stated above, the court denies defendant's motion to dismiss the complaint to the extent it is based upon the argument that the confidentiality provisions themselves are unenforceable as a matter of law.
b. Is plaintiff prohibited from enforcing the settlement agreement because allegedly he has already breached its provisions himself?
Defendant further argues that she should be excused from fulfilling her confidentiality obligations since plaintiff himself also breached the agreement. To support this argument, she points to numerous news articles, which purport to show unauthorized disclosures by plaintiff in violation of paragraph 3 of the settlement agreement (see Champion aff exs 13-19).
While it is true that "performance by the plaintiff" is a necessary element of a breach of contract claim, the other party will only be excused from performance if the breach is material (Markham Gardens v. 511 9th, 38 Misc 3d 325, 331 [Sup Ct Nassau Cty 2012]). A breach is "material" if it "goes to the root of the agreement between the parties" (id.). But determining [*9]whether a material breach has occurred is generally a question of fact (id., citing Restatement (Second) of Contracts § 241). The court has considered the articles and exhibits attached by defendant that purportedly show unauthorized disclosures by plaintiff. To the extent such items are pertinent, there is certainly, at this juncture, a question of fact as to whether plaintiff's purported breaches—allegedly exposed by the articles in question—are material.
Of the seven articles cited by defendant, plaintiff contends that at least six of them bear no relation to the subject matter of the settlement agreement. The articles can be described as mere 'puff pieces' in which plaintiff discusses, in the broadest terms, members of his family. For defendant to rebut such a characterization, it must be clear that plaintiff's statements, on their face, rise to the appropriate level of materiality justifying the termination of the agreement (Bear Stearns Funding, Inc. v Interface Group-Nevada, Inc., 361 F Supp 2d 283, 291 [SDNY 2005]). Defendant has not made such a showing on this motion to dismiss and there are issues of fact as to whether these statements constitute a material breach. Accordingly, the court denies the defendant's motion to dismiss the complaint because, at this early juncture, it is not clear that plaintiff effectively terminated the agreement by committing material breaches himself.
c. Do the confidentiality provisions run afoul of public policy?
Defendant further contends that enforcing the confidentiality agreement between the parties would violate vital public interests regarding freedom of speech. In a nutshell, defendant's position is that enforcing a waiver of First Amendment rights for the purpose of insulating a public official from unpleasant attacks will "plainly undermine [a] core First Amendment principle" (Oversbey v. Mayor of Baltimore, 930 F3d 215, 224 [4th Cir 2019] [holding settlement agreement's non-disparagement provision unenforceable]. To further bolster this argument, defendant relies on Justice Greenwald's decision denying plaintiff's brother's request for a preliminary injunction to prevent Mary Trump from publishing her book, in which Justice Greenwald held that the applicable confidentiality provision, "viewed in the context of the current Trump family circumstances," would "offend public policy" (Trump v. Trump, 69 Misc 3d 285 [Sup Ct Dutchess Cty 2020] (plaintiff's brief at 19).
Justice Greenwald's decision, however, centered on a prior restraint analysis, and his holding should be confined to that context. The full text of Judge Greenwald's quote is that the applicable confidentiality provision would "offend public policy as it would be a prior restraint on [defendant's] speech" (id. at 308). Justice Greenwald further noted that "the First Amendment requires that [a plaintiff] remedy its harms through damages proceeding rather than through suppression of protected speech" (id., citing CBS v. Young, 522 F2d 234 [6th Cir 1975]). Thus, Justice Greenwald's decision actually affirms the notion that the instant action is the proper manner for plaintiff to enforce the settlement agreement without offending defendant's First Amendment rights.
Indeed, in considering the argument that the enforcement of the settlement agreement necessarily violates Mary Trump's First Amendment rights, then-Presiding Justice Scheinkman of the Appellate Division, Second Department had made the following observations:
"While Ms. Trump unquestionably possesses the same First Amendment expressive rights belonging to all Americans, she also possesses the right to enter into contracts, including the right to contract away her First Amendment rights. Parties are free to limit their First Amendment rights by contract (see Trump v. Trump, 179 AD2d 201, 205-206; Ronnie Van Zant. v Cleopatra Records, 906 F3d 253, 257 (2d Cir); Speken v. Columbia, 304 AD2d 489, 490; Anonymous v. Anonymous, 233 AD2d 162, 163). A court may [*10]enforce an agreement preventing disclosure of specific information without violating the restricted party's First Amendment rights if the party received consideration in exchange for the restriction (see Democratic National Committee v. Republican National Committee, 673 F.3d 192, 204-207 (3d Cir). A party may effectively relinquish First Amendment rights by executing a secrecy agreement in which the party receives significant benefits (see Alfred A. Knopf Inc. v Colby, 509 F2d 1362, 1370 [4th Cir 1975])." (Trump v Trump, 2020 NY App LEXIS 5683, *9 [2d Dept 2020]).
Justice Scheinkman further wrote "Here, the plaintiff has presented evidence that Ms. Trump, in exchange for valuable consideration, voluntarily entered into a settlement agreement to resolve contested litigation" (id.). "In that settlement agreement, she agreed not to publish a book concerning the litigation or her relationship with the parties" (id.). "The settlement agreement," Justice Scheinkman further noted, "reflects that [Mary] Trump was represented by counsel and, indeed, her counsel themselves also agreed to confidentiality" (id.). Thus, as Justice Scheinkman concluded, "The Court perceives it to be reasonable for a well-known and prominent family to collectively agree, as part of the settlement of a highly-publicized internal family dispute, to confidentiality provisions under which all parties agree to maintain family privacy regarding intimate family matters" (id. at *10). "Confidentiality agreements," Justice Scheinkman added, in the absence of an injunction, "are alternatively enforceable through the imposition of money damages" (id.).
In light of Judge Scheinkman's observations, this court finds that enforcing the settlement agreement is not contrary to public policy as a matter of law. In so doing, the court does not minimize the importance of protecting First Amendment rights, including those of Mary Trump. Rather, the court only recognizes that every person is also free to contractually limit her own First Amendment rights, and that a proper remedy for harm springing from a party's alleged inability to comply with such contract-erected limitation is the imposition of money damages (Trump v Trump, supra, 69 Misc 3d at 307). In this action, plaintiff attempts to do precisely that.
Moreover, it would be unfair—and/or perhaps a bit naive—to portray Mary Trump as merely a whistleblower who sought only to assist a group of journalists in their reporting on a story of significant public interest. Although Mary Trump may have had the noblest intentions, she also proceeded to publish a book in alleged violation of her confidentiality obligations, which purportedly went on to sell millions of copies (complaint at 89). Under such circumstances, this court cannot invalidate the agreement on public policy grounds. This is especially true considering that this court has already ruled that the overall settlement agreement itself is enforceable;[FN12]
that Mary Trump received over $2 million dollars in consideration for entering into the agreement; that Mary Trump was represented by sophisticated counsel at the time the terms of the settlement agreement were negotiated; and that defendant's publishing of the book further generated significant profits for her.
The question, therefore, for this court is not whether enforcement of the settlement agreement's applicable confidentiality provision would violate Mary Trump's First Amendment rights. Justice Greenwald already ruled that plaintiff and other members of plaintiff's family [*11]cannot prevent Mary Trump from engaging in speech concerning her relationship with plaintiff. Instead, the question is whether the speech was proper under the parties' agreement—and if it was not—whether and to what degree the speech has damaged plaintiff. To hold that the agreement is unenforceable per se would prevent the adjudication of those issues. Therefore, this court holds that paragraph 2 of the settlement agreement does not run afoul of public policy as a matter of law.
3. Are plaintiff's remaining claims duplicative of his contract claim?
"Ordinarily, a breach of the duty of good faith and fair dealing is considered a breach of contract" and "[r]aising both claims in a single complaint is redundant" (ARS Kabirwala, LP v. El Paso Kabirwala Cayman Co., [2017 WL 3396422, at *4 [SDNY 2017]); see also Mill Fin., LLC v. Gillett, 122 AD3d 98, 104 [1st Dep't 2014]). Plaintiff's implied covenant and contract claim is based upon Mary Trump's disclosure of purportedly "confidential information" to The Times and in her book (complaint at 80, 96-98, 104). Because the implied covenant claim is not "based on allegations different from those underlying the accompanying breach of contract claim," it is "redundant and must be dismissed" (ARS Kabirwala, 2017 WL 3396422, at *4).
Further, and simply put, an unjust enrichment claim cannot lie where a "relevant contract exists" (In re Gen. Motors LLC Ignition Switch Litig., 257 F Supp 3d 372, 433 [SDNY 2017]); see also Ga. Malone & Co. v. Rieder, 19 NY3d 511, 516 [2012]). Accordingly, since, there is no genuine dispute regarding the creation and existence of the settlement agreement, the unjust enrichment claim is precluded (Clark-Fitzpatrick, Inc. v. Long Island RR Co., 70 NY2d 382, 388 [1987]).
CONCLUSION
Accordingly, it is
ORDERED that defendant Mary Trump's motion dismiss the complaint (motion sequence number 002) is granted in part and denied in part; and it is further
ORDERED that defendant Mary Trump's motion to dismiss the complaint is granted to the extent that it seeks to dismiss the second cause of action (breach of the duty of good faith and fair dealing) and the third cause of action (unjust enrichment), and, therefore, the second cause of action and the third cause of action are hereby dismissed; and it is further
ORDERED that defendant Mary Trump's motion to dismiss the complaint is denied to the extent that it seeks to dismiss the first cause of action (breach of contract); and it is further
ORDERED that defendant Mary Trump's application for legal fees and costs pursuant to NY Civil Rights Law § 70-a(1)(a) is denied; and it is further
ORDERED that defendant Mary Trump shall e-file an answer within 30 days of the date of entry of the within decision and order.
June 9, 2023
ROBERT R. REED, J.S.C.

Footnotes

Footnote 1:See, e.g., Today, Donald Trump on New Hampshire Win (Full Interview), YouTube, at 3:45-51 (Feb. 10, 2016), https://youtu.be/vQal9FMbkcw (Q: "Real quickly. When are you going to release your tax returns?" Trump: "Probably over the next few months. They're being worked on right now."); Meet the Press, NBC News (Jan. 24, 2016), https://www.nbcnews.com/meet-the-press/meet-press-january-24-2016-n503241 (Q: "Will you release any of your tax returns for the public to scrutinize?" Trump: "Well, we're working on that now. I have very big returns, as you know, and I have everything all approved and very beautiful and we'll be working that over in the next period of time, Chuck. Absolutely."); Virgin Media Television, Colette Fitzpatrick Meets Donald Trump!, YouTube, at 1:29-1:45 (May 20, 2014), https://www.youtube.com/watch?v=Hg- 5KEt1Abg ("If I decide to run for office, I'll produce my tax returns, absolutely. And I would love to do that.").

Footnote 2:To communicate, Mary and Craig used anonymous cell phones, also known as burners (id. at 46-47).

Footnote 3:Trump v Trump, 68 Misc 3d 593 (Sup Ct Dutchess Cty 2020).

Footnote 4:The Dutchess County Supreme Court (Greenwald, J.) ultimately denied the injunction in its entirety (Trump v Trump, 69 Misc 3d 285 [Sup Ct Dutchess Cty 2020]).

Footnote 5:See Mary L. Trump v. Donald J. Trump, et. al., 77 Misc 3d 543 (Sup Ct NY Cnty 2022] [court granting defendant's motion to dismiss, holding that the same settlement agreement at issue in the current action was enforceable and that, pursuant to that agreement, Mary Trump had released all her claims against Donald Trump].

Footnote 6:See Mary L. Trump v Donald J. Trump, 2023 NY Misc LEXIS 2115 (Sup Ct NY Cty 2023).

Footnote 7:See Nicholas v. Bratton, 376 F Supp 3d 232, 279 (SDNY 2019) ("Entrenched in Supreme Court case law is the principle that the First Amendment's protections for free speech include a constitutionally protected right to gather news"); Matter of Holmes v. Winter, 22 NY3d 300, 310 (2013) ("New York public policy as embodied in the Constitution and our current statutory scheme provides a mantle of protection for those who gather and report the news—and their confidential sources— that has been recognized as the strongest in the nation").

Footnote 8:Hampton Navigation, moreover, involved an oral agreement (245 AD2d at 486).

Footnote 9:To further support her argument that the lack of a durational term renders the settlement agreement between the parties herein unenforceable, defendant recently notified this court, pursuant to Commercial Division Rule 202.8-c, that, after the parties had submitted their motion papers and had been heard on oral argument on the current motion, the Supreme Court of the United States rendered a decision in New York v New Jersey, 143 S Ct 918 (2023), that this court should consider. In her attorneys' letter, defendant contends that the reasoning in that decision mandates the dismissal of the complaint herein (NYSCEF Doc No 81). In New York v New Jersey, the Supreme Court held that New Jersey may unilaterally withdraw from the 1953 Waterfront Commission Compact between New Jersey and New York because the agreement was for an indefinite term. The 1953 agreement between those states contemplated continuous cooperation between the states in curbing corruption, the formation of a bi-state police agency, and the employment of numerous officers to provide services to crack down on organized crime in the designated areas. As such, the agreement between New York and New Jersey was one for the ongoing provision of labor and services, which is readily distinguishable from the settlement agreement and confidentiality provisions herein at issue. The Supreme Court decision in New York v New Jersey, therefore, offers no instruction for the matter now at bar, where there is no ongoing obligation to undertake physical labor, to expend financial resources, or to engage in policy discussions and communications with any counterparty. In the matter at bar, in exchange for valuable consideration long ago given, the parties are required only to refrain from disclosing certain information. The settlement agreement in the matter at bar, in essence, requires not action, but inaction. Thus, this court will follow binding First Department precedent, which unambiguously holds that the absence of durational limits in the context of confidentiality agreements (as opposed to contracts for labor and services) does not render such agreements void as a matter of law (see Ashland Management v. Altair Investments, 59 AD3d 97, 104 [1st Dep't 2008]).

Footnote 10:Paragraph 1 reads as follows: Each of the "Proponents" as well as the "Respondent/Objectants" as well as each of the Plaintiffs and Defendants in the Supreme Court, Nassau County action (Index No. 6795/2000) have unanimously agreed that the public has no interest in the particular information involved in the "global" resolution of their differences. Confidentiality is, in certain circumstances, necessary in order to protect the litigants and encourage a fair resolution of the matters in controversy. The interests herein favor confidentiality and confidentiality should be provided, the "Objectants/ Respondents" and all Plaintiffs and Defendants in the Supreme Court, Nassau County action will join in the motion to seal these records.

Footnote 11:Paragraph 2 reads as follows: Paragraph 2 of the settlement agreement reads as follows:
"Without obtaining the consent of DONALD J. TRUMP [or the other 'Proponents/Defendants'] MARY L. TRUMP [and the other 'Objectant/Plaintiffs'] shall not disclose any of the terms of this Agreement and Stipulation, and in addition shall not directly or indirectly publish or cause to be published, any diary, memoir, letter, story, photograph, interview, article, essay, account, or description or depiction of any kind whatsoever, whether fictionalized or not, concerning their litigation or relationship with the 'Proponents/Defendants' or their litigation involving the Estate of FRED C. TRUMP, and the Estate of MARY ANNE TRUMP, or assist or provide information to others in connection therewith."

Footnote 12:See Mary Trump v. Donald J. Trump et al, 77 Misc 3d 543 [Sup Ct NY Cty 2022] [dismissing Mary Trump's complaint attempting, among other things, to invalidate the settlement agreement].